IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SIGA TECHNOLOGIES, INC., a Delaware Corporation, | § § § | No. 20, 2015 |
| Defendant Below, Appellant/Cross-Appellee, | § § § | Court Below: Court of Chancery of the State of Delaware |
| v. | § § | C.A. No. 2627-VCP |
| PHARMATHENE, INC., a Delaware Corporation, | § § § | |
| Plaintiff Below, Appellee/Cross-Appellant. | § § | |

Submitted: October 7, 2015
Decided: December 23, 2015
Corrected: December 28, 2015

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED**.

Stephen P. Lamb, Esquire *(Argued)*, Meghan M. Dougherty, Esquire, Matthew D. Stachel, Esquire, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Wilmington, Delaware, for Defendant Below, Appellant/Cross-Appellee SIGA Technologies, Inc.

**Roger Crane, Esquire** *(Argued),* **K&L Gates LLP, New York, NY**, Christopher A. Selzer, Esquire, McCarter & English, LLP, Wilmington, Delaware, for Plaintiff Below, Appellee/Cross-Appellant PharmAthene, Inc.

**SEITZ**, Justice, for the Majority:

## I.    INTRODUCTION

This is the second appeal by SIGA Technologies, Inc. ("SIGA") from a Court of Chancery judgment awarding PharmAthene, Inc. ("PharmAthene") damages stemming from failed merger and license negotiations between the parties.  In the first appeal, this Court upheld the Court of Chancery's finding that SIGA in bad faith breached its contractual obligation to negotiate a license agreement consistent with the parties' license agreement term sheet, known throughout this litigation as the "LATS."  This Court also held that where parties have agreed to negotiate in good faith, and would have reached an agreement but for the defendant's bad faith conduct during the negotiations, the plaintiff can recover contract expectation damages, so long as the plaintiff can prove damages with reasonable certainty.  Because the Court of Chancery ruled out expectation damages in its first decision, this Court remanded the case to reconsider an award of damages to SIGA in a decision we will call "*SIGA I*."[1]

The Court of Chancery did as instructed and reevaluated the evidence, including evidence of expectation damages.  Although the court previously found that lump-sum expectation damages were too speculative to recover, the Court of Chancery held on remand that PharmAthene met its burden of proving with reasonable certainty

---

[1] *SIGA Techs. Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 347 (Del. 2013) [hereinafter *SIGA I*].

2

expectation damages and awarded PharmAthene $113 million.[2] The parties once again appealed to this Court.

SIGA raises essentially two claims of error in the current appeal: first, the Court of Chancery was not free to reconsider its prior holding that lump-sum expectation damages were too speculative; and, second, if reconsideration was permitted, the expectation damages awarded following remand were too speculative. After careful consideration of SIGA's arguments, we find that the law of the case doctrine did not preclude the Court of Chancery from reconsidering its earlier determination that lump-sum expectation damages were too speculative. In *SIGA I*, this Court clarified that expectation damages were available, instructed the Court of Chancery to revisit its damages award, directed the trial court to reevaluate the helpfulness of expert testimony, and permitted the court to make any order in further progress of the case not inconsistent with the *SIGA* I decision. The Court of Chancery followed the law of the case by complying with the mandate in *SIGA I*.

We also find that the court did not abuse its discretion when it awarded PharmAthene lump-sum expectation damages, and its factual findings supporting its new damages determination were not clearly erroneous. The Court of Chancery considered anew all issues relevant to the remedy, including the uncertainty caused by the wrongdoer's breach. When a party breaches a contract, that party often creates a course of events that is different from those that would have transpired absent the breach. The

---

[2] *PharmAthene, Inc. v. Siga Techs., Inc.*, 2015 WL 220445, at *1 (Del. Ch. Jan. 15, 2015) [hereinafter Final Remand Order].

3

breaching party cannot avoid responsibility for making the other party whole simply by arguing that expectation damages based on lost profits are speculative because they come from an uncertain world created by the wrongdoer. Rather, when a contract is breached, expectation damages can be established as long as the plaintiff can prove the *fact* of damages with reasonable certainty. The *amount* of damages can be an estimate.[3] When awarding lump-sum expectation damages for breach of a Type II contract, the Court of Chancery correctly took into account all the circumstances of the breach, including the wrongdoer's willfulness,[4] especially when the wrongdoer caused uncertainty about the economic terms of the transaction by its failure to negotiate in good faith.[5] Accordingly, we affirm the judgment of the Court of Chancery.

## II.    FACTUAL BACKGROUND[6]

### A.    SIGA's Development Of ST-246

In 2004, SIGA acquired technology for ST-246, an antiviral drug for the treatment of smallpox. At that time, the viability, potential uses, safety, and efficacy of the drug, as

---

[3] *Beard Research, Inc v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010), *aff'd sub. nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010); *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002) (quoting *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992)).

[4] *Cura Fin. Servs. N.V. v. Elec. Payment Exch., Inc.*, 2001 WL 1334188, at *20 (Del. Ch. Oct. 22, 2001) (citing RESTATEMENT (SECOND) OF CONTRACTS § 352 cmt. a (1981)).

[5] *Beard*, 8 A.3d at 613 ("Public policy has led Delaware courts to show a general willingness to make a wrongdoer 'bear the risk of uncertainty of a damages calculation where the calculation cannot be mathematically proven.'") (quoting *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *23 (Del. Ch. Jan. 29, 2010) (citing *Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1023 (Del. 2001); *Henne v. Balick*, 146 A.2d 394, 396 (Del. 1958); *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 855 A.2d 1059, 1067 (Del. Ch. 2003); *Dionisi v. DeCampli*, 1995 WL 398536, at *18 (Del. Ch. June 28, 1995)).

[6] The background facts are taken from the extensive record in both appeals.

4

well as the likelihood of SIGA obtaining regulatory approval or making sales to the government, were, as is typical in this industry, uncertain.

By late 2005, SIGA was running out of money, its largest shareholder, MacAndrews & Forbes, refused to invest additional funds, and the NASDAQ threatened to de-list its shares. SIGA estimated that it needed an additional $16 million to complete development of the drug. On top of its financial problems, SIGA was having trouble developing ST-246 because it had no experience or employee expertise bringing a drug to market.

## B. SIGA And PharmAthene Negotiate A Business Collaboration

In dire straits, SIGA began discussing a possible collaboration with PharmAthene. This was not their first attempt to work together. PharmAthene had previously backed out of merger negotiations between the parties in late 2003. Nevertheless, Thomas Konatich, SIGA's Chief Financial Officer, contacted Eric Richman, PharmAthene's Vice President of Business Development and Strategies, to begin discussions. According to Richman's contemporaneous notes, due to the prior failed attempt at a merger and to SIGA's need for a fast cash infusion, SIGA insisted on framing a license agreement before discussing a potential merger.

Both companies put together teams to negotiate the potential business collaboration. On SIGA's side, in addition to CFO Konatich, the key participants included the Chairman of SIGA's board, Donald Drapkin, who also served as the Vice Chairman of SIGA's biggest stockholder, MacAndrews & Forbes; SIGA's Chief Scientific Officer, Dennis Hruby, who kept SIGA's senior management apprised of

5

ST-246's scientific developments; and then-board member and current Chief Executive Officer, Eric Rose. SIGA's financial controller, Ayelet Dugary, prepared financial projections that informed the negotiations. Additionally, several in-house lawyers from MacAndrews & Forbes took an active role in negotiating with PharmAthene on SIGA's behalf, including Michael Borofsky who was involved in negotiating the terms of the LATS; and Steven Fasman, who worked with SIGA personnel to prepare a valuation of ST-246, and who was involved in discussions with PharmAthene after SIGA experienced positive developments and backed out of the merger and the LATS negotiations. SIGA also hired attorney Nicholas Coch to represent it in communications with PharmAthene's attorney right before SIGA breached its obligation to negotiate a license agreement according to the LATS.

PharmAthene's team, assembled by Richman, included CEO David Wright; CFO Ronald Kaiser; and board member Elizabeth Czerepark; as well as attorney Jeffrey Baumel. PharmAthene also later hired attorney Elliot Olstein who communicated with SIGA's attorney Coch in the time leading up to SIGA's breach.

### 1. SIGA And PharmAthene Negotiate And Sign The LATS

Konatich and Richman led the negotiations over the license agreement on behalf of their companies. The Court of Chancery found that at the end of 2005, the parties conservatively valued ST-246's market potential at around $1 billion to $1.26 billion.[7] The parties reflected their negotiations in the specific terms of the LATS, with the last

---

[7] *PharmAthene, Inc. v. Siga Techs., Inc.*, 2011 WL 4390726, at *3 (Del. Ch. Sept. 22, 2011) [hereinafter 2011 Opinion].

revisions dated January 26, 2006. This final version of the LATS was titled "SIGA/PharmAthene Partnership" and the footer of the document read: "Non Binding Terms."[8] The objective read: "To establish a partnership to further develop & commercialize [ST-246] for the treatment of Smallpox and orthopox related infections and to develop other orthopox virus therapeutics."[9] The LATS provided that SIGA would grant PharmAthene a worldwide, exclusive license to use, develop, sell, and sublicense ST-246 and related products. The LATS also contemplated a joint research and development committee and allocated certain roles on the committee to PharmAthene and SIGA. PharmAthene would also fund research at SIGA based on a defined research and development plan and budget.

The LATS included a number of economic terms. PharmAthene had to pay a total "License Fee" of $6 million, consisting of (1) a $2 million upfront cash payment; (2) a $2.5 million deferred license fee to be paid 12 months after the execution of a license agreement upon the occurrence of certain events; and (3) a $1.5 million payment to be made after SIGA obtained over $15 million in financing. The LATS also required PharmAthene to pay up to an additional $10 million for SIGA's achievement of certain milestones such as meeting specific sales targets and obtaining necessary regulatory approvals. Additionally, PharmAthene was required to make incremental annual royalty payments on net sales of "Patented Products" on a sliding percentage scale of between 8% and 12%, depending on the amount of yearly sales. SIGA was also "entitled to

---

[8] App. to Answering Br. at 1498 (The License Agr. Term Sheet).
[9] *Id.*

7

receive 50% of any amounts by which [the] net margin exceed[ed] 20% on sales to the [U.S.] Federal Government."[10]  After negotiating the LATS, the parties turned their focus to merger negotiations.

### 2. SIGA And PharmAthene Enter Into A Bridge Loan Agreement And A Merger Agreement

Due to SIGA's precarious financial position, PharmAthene agreed to provide SIGA with bridge financing for continued development of ST-246 while the parties negotiated a merger.  On March 20, 2006, the parties entered into a Bridge Loan Agreement whereby PharmAthene loaned SIGA $3 million.  Section 2.3(a) of the Bridge Loan Agreement bound the parties to negotiate in good faith a license agreement in accordance with the terms of the LATS if the merger was terminated or not executed, and imposed a 90-day exclusivity period.[11]

After executing the Bridge Loan Agreement, SIGA and PharmAthene continued to negotiate the merger.  In connection with the merger discussions, PharmAthene created a financial model in February 2006 based on SIGA's evaluation of ST-246's market potential (the "PharmAthene Model").  On June 8, the parties signed a Merger

---

[10] *Id.* at 1499.

[11] App. to Opening Br. at 132 (Bridge Loan Agreement § 2.3(a)):

> Upon any termination of the Merger Term Sheet . . . , termination of the Definitive Agreement relating to the Merger, or if a Definitive Agreement is not executed . . . , SIGA and PharmAthene will negotiate in good faith with the intention of executing a definitive License Agreement in accordance with the terms set forth in the [LATS] and [SIGA] agrees for a period of 90 days during which the definitive license agreement is under negotiation, it shall not, directly or indirectly, initiate discussions or engage in negotiations with any corporation, partnership, person or other entity or group concerning any Competing Transaction without the prior written consent of the other party or notice from the other party that it desires to terminate discussions hereunder.

Agreement. Section 12.3 of the Merger Agreement imposed a similar obligation on the parties to negotiate in good faith a license agreement in accordance with the LATS if the merger was terminated.[12] The Merger Agreement had a drop-dead date of September 30. The parties attached the LATS as an exhibit to the Bridge Loan Agreement and the Merger Agreement.

### C. ST-246's Prospects Improve As The Drug Hits Development Milestones And SIGA Acquires Funding

After the parties signed the Merger Agreement, SIGA experienced several positive developments, the most important of which related to developments suggesting that ST-246 had bright prospects. First, on June 9, SIGA's Chief Scientific Officer, Hruby, received news of a $5.4 million award for ST-246 from the National Institute of Allergy and Infectious Disease.[13] Hruby informed Konatich of the grant in an email, to which Konatich responded: "[I]t is a damn shame we had to merge."[14] Hruby stated in his response: "With the 5.4M grant being activated, the 10.9M BAA award on its way, an 8M grant pending along with a couple of appropriations—we could have gone all the way ourselves. Instead we got sold into slave labor and if anything the [PharmAthene] gang

---

[12] *Id.* at 271 (Merger Agreement § 12.3):
> Upon any termination of this Agreement, SIGA and PharmAthene will negotiate in good faith with the intention of executive a definitive License Agreement in accordance with the terms set forth in the [LATS] and SIGA agrees for a period of 90 days during which the definitive license agreement is under negotiation, it shall not . . . initiate discussions or engage in negotiations with any corporation, partnership, person or other entity or group concerning any Competing Transaction . . . without the prior written consent of PharmAthene . . . .

[13] App. to Answering Br. at 807–08 (Email Chain between Hruby and Konatich).
[14] *Id.* at 807.

will drag us down."[15] Next, on July 13, SIGA announced that "its lead smallpox drug candidate, [ST-246], has successfully completed the first planned human clinical safety trial."[16] Then, on September 13, Hruby called Richman to tell him that personnel at the Centers for Disease Control and Prevention, where tests of ST-246 were conducted, "are beside themselves—never saw anything like it."[17]

A few months later, on September 27, Hruby emailed a number of high-level SIGA officials (including CEO, Donald Drapkin, and board member Adnan Mjalli) to inform them of the company's recent accomplishments. In this email, Hruby lauded the success of recent trials of ST-246 as "excellent" and having "no adverse effects."[18] He also noted that he presented to the Department of Homeland Security and the Department of Defense ("DoD") the week before, and that the agencies were "very 'impressed' and both indicated acquisitions in the future."[19] He further explained that "[the Department of Homeland Security] is developing an implementation plan that will be disclosed ~ Jan. 1 that should spell out the timing and size of the acquisition. Of note, both groups also indicated an interest in acquiring our HFV antivirals in development."[20] Notably, Hruby also announced the following:

> [W]e just received today notice of award on a $16.5M contract from the [National Institutes of Health] to fund all ST-246 development activities up to and through the NDA filing. Bottom line is the product's entire

---

[15] *Id.*

[16] *Id.* at 811 (SIGA Press Release).

[17] *Id.* at 1133 (Email from Richman to Wright).

[18] *Id.* at 1135 (Email from Hruby to Drapkin).

[19] App. to Answering Br. at 1135.

[20] *Id.*

development is supported, we have all the necessary partnerships and advocates in place, and we have the team in place to see it through.[21]

After pointing out all of SIGA's recent successes, Hruby concluded in his email:

> I have grave concerns about the merger as it is currently going forward in that it appears that the merged company will not be [Small Business Innovation Research] compliant. In that case, we would have to shut down $30M in current grants and contracts and damage all the positive relationships we have developed to date.[22]

When Hruby testified at trial, he stated that his representation that $30 million would be lost "might have been an exaggeration."[23]

**D.      SIGA Terminates The Merger Agreement And Proposes A LLC Agreement In Place Of A Licensing Agreement In Accordance With The Terms Of The LATS**

Meanwhile, the Merger Agreement's drop-dead date of September 30 approached, but the SEC had not yet approved SIGA's draft of the related proxy statement. On October 3, Fasman emailed Hruby stating: "Here is the decision to be reached: Should SIGA continue with its merger plans or should it try to go it alone?"[24] SIGA's board met the next day. According to the board minutes, Chairman Drapkin discussed the planned merger and whether SIGA should exercise its right to terminate the merger given that it did not close before September 30, or whether SIGA should grant PharmAthene an extension. Hruby gave a presentation about SIGA's scientific results and Konatich presented on SIGA's financial status. At this meeting, the SIGA board resolved to terminate the Merger Agreement.

---

[21] *Id.*
[22] *Id.*
[23] *Id.* at 2574 (Trial Test. of Hruby).
[24] *Id.* at 1141 (Email from Fasman to Hruby).

Two weeks later, SIGA publicly announced that the results of a primate trial showed that ST-246 provided 100% protection against smallpox. On October 18, SIGA's Controller, Dugary, emailed Konatich and SIGA's legal representatives a financial analysis concluding that total past and future development costs equaled $39.66 million, and that a $40 million upfront license fee would support a 50-50 split of ST-246's profits.[25] On October 19, SIGA announced a $9 million private placement whereby it sold two million shares of its stock at a price three times greater than SIGA's 2005 share price.

On October 26, PharmAthene attorney Elliot Olstein emailed SIGA attorney Nicholas Coch, advising Coch that PharmAthene was prepared to sign its proposed draft of the license agreement.[26] Coch responded that the nature of the negotiations necessitated a meeting.[27]

On November 6, the parties met for the first time since SIGA's termination of the merger agreement to discuss a license agreement. Richman attended the meeting with PharmAthene attorneys Baumel and Olstein. Konatich and Rose were present on SIGA's side along with their legal counsel, Coch and attorney Fasman. Fasman spoke to SIGA's perspective, emphasizing the LATS's reference to a "partnership" between the parties and the need to revise some of the economic terms of the LATS. He proposed a $40 to

---

[25] App. to Answering Br. at 1166–70 (SIGA ST-246 Market Potential Presentation).
[26] 2011 Opinion at *9.
[27] *Id.*

$45 million upfront fee and a 50-50 profit split. Olstein insisted that the parties were bound by the LATS but allowed SIGA to put together a formal proposal.

On November 9, SIGA announced that ST-246 demonstrated protection against the monkeypox virus in two primate trials. Then, on November 21, SIGA sent PharmAthene a draft LLC Agreement that departed drastically from the terms of the LATS in a way that strongly favored SIGA.

### E. SIGA's Internal Valuation Of ST-246 Ranged Between $3 Billion And $5.6 Billion Before SIGA's Breach

With SIGA's proposed draft of an LLC agreement in the background, in a series of emails on November 27 and 28, Fasman communicated with SIGA's senior management—including CFO Konatich, CEO Drapkin, Controller Dugary, and two board members—about ST-246's valuation.[28] Fasman's initial email on November 27 criticized the PharmAthene Model, which reflected sales of between $300 million and $700 million per year starting in 2008, calling this projection "clearly erroneous."[29] Fasman attached a revised revenue projection that he prepared with input from Konatich and Dugary, and proposed that SIGA should advocate to use the assumptions in his projection in its discussions with PharmAthene.[30] He concluded, "[a]s you will see, all of the individual assumptions are easily justified, and the result shows a *3 billion* valuation

---

[28] App. to Answering Br. at 1189–201 (Fasman Emails).

[29] *Id.* at 1189 ("Nonetheless, PharmAthene's projection is clearly erroneous in several important respects. For example, PharmAthene assumes that the drug is useful only for populations where vaccine is contra-indicated. PharmAthene also grossly understates the potential for foreign sales. At the same time, PharmAthene assumes that [ST-246] can be sold for $100/treatment in the U.S. and $150/treatment abroad, prices that appear to us excessive.").

[30] *Id.* at 1190–91.

13

for [ST-246], which makes the financial terms that SIGA proposed in the [LLC Agreement between SIGA and PharmAthene] draft circulated last week a bargain."[31] Fasman also noted in this email that "PharmAthene assumes that [ST-246] can be sold for $100/treatment in the U.S. and $150/treatment abroad, prices that appear to us to be excessive."[32]

A comparison of the parties' assumption attached to Fasman's email shows that SIGA assumed a price of $75 per course of treatment in the U.S. and $100 abroad (with a smaller net margin abroad due to greater marketing expenses).[33] The comparison table revealed additional differences between the parties' assumptions. For example, PharmAthene assumed a 5% contraindication rate[34] for purchase into the Strategic National Stockpile (the "National Stockpile") whereas SIGA's table stated that ST-246 can be "therapeutic, prophylactic and adjuvant" and assumed a 20% contraindication rate,[35] which Fasman lowered to 15% in a subsequent email.[36] Also, as to purchase of ST-246 into the National Stockpile, the table reflected that PharmAthene's view was that the "[r]equirement does not yet exist—dependent on DHHS 'integration plan' to be

---

[31] *Id.* at 1189 (emphasis added). Fasman also stated that he intended to share these documents with PharmAthene at a meeting the following afternoon. *Id.*

[32] *Id.* at 1189.

[33] *Id.* at 1190.

[34] The Court of Chancery noted that "[c]ontraindication rate refers to the fact that, for any number of reasons, a vaccine will not be effective at preventing or curing a disease for some particular individuals." *PharmAthene, Inc. v. SIGA Techs., Inc.*, 2014 WL 3974167, at *15 n.70 (Del. Ch. Aug. 8, 2014) [hereinafter Remand Opinion].

[35] App. to Answering Br. at 1190.

[36] *Id.* at 1200.

released IQ 07," and SIGA's column stated "same."[37]   Additionally, relative to PharmAthene, SIGA assumed higher sales to the military because it assumed that the size of the military would grow with the population.[38]   Finally, the table reflected PharmAthene's position that sales of ST-246 to the [DoD] may require FDA approval, but SIGA's position was that this was "[n]ot true, or not an obstacle."[39]

In response to Fasman's initial email, Dugary suggested that Fasman raise the profit margin used in his projection: "I think the excel spreadsheet you sent reflected only 33% margin.  If you recalculate (see attached revised) with the 75% margin, the net present value increases to *$5.1 billion*."[40]   Fasman replied to inform the group that he raised the profit margin, but that this resulted in a net present value that was "unreasonably high."[41]   He further explained in his email that he made additional adjustments to his original valuation to come up with a net present value of *$5.6 billion*, calling this "more than sufficient for [SIGA's] needs."[42]   In another email sent later that day, however, Fasman noted that "accepting [PharmAthene's] treatment and pricing assumptions, which would lead to a profit margin in excess of 90%, and otherwise using the same cost and discounting assumptions that the prior spreadsheet used, leads to a

---

[37] *Id.* at 1190.
[38] *Id.*   PharmAthene assumed a 10% contraindication rate for military personnel, but SIGA assumed that the government would purchase ST-246 for 50% of the then-current military population because that population would grow.
[39] *Id.*
[40] *Id.* at 1193 (emphasis added).
[41] *Id.* at 1195.
[42] *Id.* (emphasis added).

present value *well in excess of $2.3 billion*."[43]  He concluded that "[b]ecause this valuation is more than sufficient to justify our upfront and milestone payments, we will begin our discussions with the [PharmAthene]-based valuation model."[44]

On December 4, SIGA attorney Coch sent a letter to PharmAthene attorney Olstein.  Coch's letter stated that SIGA received PharmAthene's projections for ST-246, reflecting a future revenue stream of over $2 billion.  He further stated that the terms in the proposed LLC agreement were realistic and fair given PharmAthene's valuation, "[a]lthough SIGA believes the actual value of [ST-246] is *well in excess of $5 billion* (based on projected sales that incorporate more realistic assumptions of the size of the market and up-to-date information concerning the likely uses of [the drug])."[45]  On December 6, Olstein replied that PharmAthene indicated at a meeting with SIGA that it was "willing to consider" a 50-50 split, and that if SIGA was "married" to having an LLC structure it should incorporate the split into that structure.  PharmAthene at no time indicated that it was "prepared to accept a 50-50 proposal or any other proposal in lieu of the binding terms of the [LATS]."[46]  On December 12, Coch sent a letter back to Olstein, stating that SIGA was prepared to negotiate a definitive agreement "without preconditions," but that if PharmAthene insisted on the terms of the LATS as binding,

---

[43] *Id.* (emphasis added).

[44] *Id.*

[45] *Id.* at 1204 n.1 (Letter from Coch to Olstein) (emphasis added).

[46] *Id.* at 1205 (Letter from Olstein to Coch).

16

then the parties would have "nothing more to talk about."[47]  About a week later, PharmAthene filed a lawsuit in the Court of Chancery.

*****

The reason for the end of negotiations has to be underscored to understand the Court of Chancery's damages award.  SIGA refused to enter into a license agreement in accordance with the LATS not because of any uncertainty about the strongly positive future results for ST-246.  Rather, SIGA refused to contract on terms consistent with the LATS because it had come to the belief that ST-246 was worth $3 billion as a conservative matter—due to events that suggested that ST-246's prospects were much brighter than when the parties agreed to the LATS.  As is the case in any business situation, SIGA's belief was based on its estimate of the future cash flow ST-246 would generate.  This reasoned estimate led SIGA first to refuse to merge, and then refuse to negotiate a license agreement on the same material terms as were in the LATS.

## III.    PROCEDURAL HISTORY

### A.    The Court of Chancery's 2011 Decision

In January 2011, the court held an eleven-day trial.  In a September 22, 2011 decision (the "2011 Decision") the Court of Chancery found, among other things, that (1) SIGA breached its contractual obligation under the Bridge Loan Agreement and the Merger Agreement to negotiate in good faith a definitive license agreement in accordance with the terms of the LATS; (2) the parties would have agreed to a license agreement that

---

[47] *Id.* at 1207 (Letter from Coch to Olstein).

was generally in accordance with the LATS had it not been for SIGA's bad faith breach;[48] (3) SIGA was liable for damages under the doctrine of promissory estoppel; and (4) the proper remedy under these circumstances was to impose an equitable payment stream based on SIGA's future profits.[49]

The Court of Chancery declined to award lump-sum expectation damages to PharmAthene, finding that "a specific sum of money representing the present value of the future profits it would have received absent SIGA's breach is speculative and too uncertain, contingent, and conjectural."[50] The Court of Chancery additionally declined to order specific performance because it would impose too great a burden on the trial court to supervise the parties to ensure that they were faithfully carrying out their obligations to negotiate a license agreement in accordance with the terms of the LATS.[51]

On May 31, 2012, the Court of Chancery issued a Final Order and Judgment together with a Letter Opinion. SIGA appealed and PharmAthene cross-appealed to this Court.

---

[48] On this point, the Court of Chancery stated:

> I [] find that, but for SIGA's bad faith negotiations, the parties likely would have reached agreement on a transaction generally in accordance with the LATS. PharmAthene was willing to agree to a license agreement for ST-246 on terms that varied "to some extent" from the LATS. . . . Had SIGA engaged in good faith negotiations, I am convinced that a license agreement between PharmAthene and SIGA for ST–246 would have resulted in terms no less favorable to PharmAthene than the 50/50 profit split it already had mentioned and an increase in the upfront and milestone payments from a total of $16 million, as specified in the LATS to something in the range of $40 million.

2011 Opinion at *38.

[49] *See* 2011 Opinion.

[50] *Id.* at *37.

[51] *Id.* at *35.

## B. The 2013 Supreme Court Decision

On May 24, 2013, in *SIGA I*, this Court affirmed the Court of Chancery's decision in part, reversed in part, and remanded for further proceedings consistent with its opinion. To begin, *SIGA I* upheld the Court of Chancery's decision that SIGA had in bad faith breached its contractual obligations under the Bridge Loan Agreement and the Merger Agreement to negotiate a license agreement in accordance with the LATS.[52]

*SIGA I* then reversed the Court of Chancery's finding that SIGA was liable on a theory of promissory estoppel. In *SIGA*, this Court reasoned that "promissory estoppel does not apply . . . where a fully integrated, enforceable contract governs the promise at issue,"[53] and in this case, there were two enforceable contracts.[54] *SIGA I* noted that the Court of Chancery "must look to the contract as a source of remedy on the breach of an obligation to negotiate in good faith."[55]

Next, *SIGA I* discussed "Type II preliminary agreements," which are "preliminary agreements [where the parties] 'agree on certain major terms, but leave other terms open for further negotiation.'"[56] After surveying the law adopted by federal courts,[57] *SIGA I* held:

---

[52] *SIGA I*, 67 A.3d at 347 (Del. 2013).

[53] *Id.* at 348.

[54] *Id.* ("The promise to negotiate in good faith for a definitive license agreement in accordance with the LATS's terms is expressly included in both the Bridge Loan and Merger Agreements."); 2011 Opinion at *21 ("By executing the Bridge Loan Agreement and the Merger Agreement, both SIGA and PharmAthene became bound by the terms of those contracts.").

[55] *SIGA I* at 348.

[56] *Id.* at 349 (quoting *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998)).

19

> [W]here the parties have a Type II preliminary agreement to negotiate in good faith, and the trial judge makes a factual finding, supported by the record, that the parties would have reached an agreement but for the defendant's bad faith negotiations, the plaintiff is entitled to recover contract expectation damages.[58]

In a footnote to this holding, *SIGA I* stated that "[a]n expectation damages award presupposes that the plaintiff can prove damages with reasonable certainty."[59]

Based on the foregoing, *SIGA I* remanded to the Court of Chancery with specific instructions to reconsider the damages issue:

> Because we had not previously addressed whether Delaware recognizes Type II preliminary agreements and permits a plaintiff to recover expectation damages, and because it is unclear to what extent the Vice Chancellor based his damages award upon a promissory estoppel holding rather than upon a contractual theory of liability predicated on a Type II preliminary agreement, we reverse the Vice Chancellor's damages award and remand the case for reconsideration of the damages award consistent with this opinion.[60]

In *SIGA I*, this Court also explained when instructing the Court of Chancery to reconsider the award of attorneys' fees:

> On remand, the Vice Chancellor shall redetermine his damage award in light of this opinion and is free to reevaluate the helpfulness of expert testimony. Therefore, we reverse the award of attorneys' fees and expenses

---

[57] *Id.* at 349–50 (discussing *Goodstein Constr. Corp. v. City of New York*, 604 N.E.2d 1356, 1360 (N.Y. 1992); *Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*, 519 F.3d 421, 428–30, 428 n.7, 429, 430 (8th Cir. 2008) (citations omitted); *Venture Assocs. v. Zenith Data Sys. Corp.*, 96 F.3d 275, 277, 278–79, 281 (7th Cir. 1996)).

[58] *Id.* at 350–51.

[59] *Id.* at 351 n.99 (citing *Callahan v. Rafail*, 2001 WL 283012, at *1 (Del. Super. Mar. 16, 2001) (citation omitted) ("It is well-settled law that 'a recovery for lost profits will be allowed only if their loss is capable of being proved, with a reasonable degree of certainty. No recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative.")).

[60] *Id.* at 351–52.

so that the Vice Chancellor may determine on remand the proper award consistent with this opinion.[61]

Finally, *SIGA I* noted that it did not reach any of PharmAthene's claims on cross-appeal, specifically acknowledging that it did not determine whether the Court of Chancery erred in declining to award specific performance, among other remedies:

> PharmAthene's claims that it is entitled to (1) an alternative payment stream based on the LATS's terms, (2) specific performance granting it a license in accordance with the LATS's terms because the LATS is an enforceable contract, or (3) recover damages under the doctrine of unjust enrichment. All those claims are alternative contentions advanced in the event we do not affirm the Vice Chancellor's judgment. Because we affirm the Vice Chancellor's finding that SIGA is liable for breaching its contractual obligations to negotiate in good faith in accordance with the LATS's terms, we do not reach these arguments.

Significant to the present appeal, *SIGA I* observed that the Court had not determined whether the Court of Chancery erred in declining to award lump-sum expectation damages because such damages were too speculative, and instead remanded for reconsideration of the issue:

> PharmAthene also contends that the Vice Chancellor erroneously failed to award PharmAthene its lump-sum expectation damages on the basis that they would be too speculative. We do not need to reach this claim either, because we reverse the Vice Chancellor's damages award and remand for him to reconsider it in light of this opinion.[62]

## C. The Court of Chancery's Decision On Remand

### 1. The Court Of Chancery Determined That It Was Not Bound By Its Prior Decision Denying Expectation Damages As Too Speculative

---

[61] *Id.* at 353.
[62] *Id.*

On remand, and over SIGA's objection, PharmAthene moved to reopen the record to introduce post-breach evidence.[63] The Court of Chancery granted PharmAthene's motion, but noted that it would evaluate any new evidence before admitting it.[64] After a two day evidentiary hearing and post-hearing briefing, on August 8, 2014, the court issued a Memorandum Opinion ("Remand Opinion"), as well as an accompanying Order instructing PharmAthene's damages expert how to adjust the damages calculation based on the Court of Chancery's findings ("Remand Order").[65]

The Vice Chancellor first addressed the threshold questions—whether the trial court may reconsider conclusions made in the 2011 Decision and, if so, whether there was any basis to change his prior holding in those respects. On the first issue, the Vice Chancellor concluded that "[t]he plain language of the Supreme Court decision indicates that I may reconsider my prior finding that an award of lump-sum expectation damages to PharmAthene would be improper because such a measure of damages is too speculative."[66] The Vice Chancellor based that conclusion on several aspects of *SIGA I*. He cited the fact that *SIGA I* did not reach PharmAthene's claim that the Court of Chancery erred in not imposing lump-sum expectation damages for being too speculative.

---

[63] *See* Ex. A to Opening Br. (Oral Arg. on Pl.'s Mot. to Reopen the R., Aug. 15, 2013).

[64] *Id.* at 31 ("[A]s to all this new evidence, I am going to have to decide, number one, does it come in at all, is it relevant, and does it meet the requirements.").

[65] *PharmAthene, Inc. v. Siga Techs., Inc.*, 2014 WL 3893449 (Del. Ch. Aug. 8, 2014) [hereinafter Remand Order].

[66] Remand Opinion at *3.

He also pointed to *SIGA I*'s instruction that the Court of Chancery was free to "reevaluate the helpfulness of expert testimony."[67]

The Vice Chancellor reasoned that the latter guidance "would be rendered largely superfluous if the rest of [*SIGA I*] is read as prohibiting [the Court of Chancery] from reconsidering whether PharmAthene is entitled to lump-sum expectation damages for SIGA's bad faith breach."[68] Thus, the Vice Chancellor concluded that "while I have the authority to reaffirm my previous decision in that regard, I am not required or bound by it to reach the same conclusion I did previously."[69]

The Vice Chancellor expressed a similar sentiment where he discussed the merits of an award of lump-sum expectation damages. There, he stated that "the Supreme Court explicitly invited me to reconsider my prior holding that an award of lump-sum expectation damages to PharmAthene for SIGA's bad faith was unduly speculative."[70] He then reasoned that a meaningful reconsideration requires a reexamination of the expert testimony relating to expectation damages. According to the Vice Chancellor, his conclusion was supported by the instruction in *SIGA I* to redetermine the attorneys' fees and expenses award, and by *SIGA I*'s holding that Type II agreements could support an award of expectation damages, noting that the uncertainty as to this point of law was part of the reason that he had imposed an equitable remedy in the first instance.

---

[67] *Id.*; *SIGA I* at 353.
[68] Remand Opinion at *3.
[69] *Id.*
[70] *Id.* at *6.

23

The Vice Chancellor then took account of the additional guidance in *SIGA I*. Specifically, he noted that, in the 2011 Decision, he "awarded PharmAthene a payment stream with terms that were significantly less favorable to it than those set out in the LATS."[71] And he acknowledged *SIGA I*'s ruling that "neither party could in good faith propose terms inconsistent with [the LATS] appears to place greater weight on the terms specified in the LATS than I afforded those terms in determining my prior damages award."[72] From this, he concluded that the Court of Chancery must "[a]t a minimum . . . reexamine the role of the terms of the LATS in crafting any such award."[73] Relatedly, the Vice Chancellor noted the reality that SIGA ended up expending materially more time and money to develop ST-246 without PharmAthene's participation than the parties contemplated in the LATS.[74] The Vice Chancellor also observed that, after the 2011 Decision, SIGA secured a lucrative U.S. government contract to sell ST-246 to the Biomedical Advanced Research Development Authority ("BARDA"). The Vice Chancellor stated that this fact "mitigates or possibly eliminates some of the concerns [] expressed in the 2011 Decision regarding ST-246's future prospects."[75]

Finding that the court was not restricted from reconsidering its prior holding that an award of lump-sum expectation damages would be too speculative, the Court of Chancery proceeded to analyze the issue on the merits.

---

[71] *Id.* at *4.

[72] Remand Opinion at *4 (quoting *SIGA I* at 351).

[73] *Id.*

[74] *Id*. at *5.

[75] *Id.* at *6.

24

## 2. The Court of Chancery Found That PharmAthene Met Its Burden Of Proving That It Was Entitled To Lump-Sum Expectation Damages

At the outset, the Court of Chancery noted that the relevant inquiry for awarding expectation damages was: "[A]t the time of SIGA's breach in December 2006, what were the parties' reasonable expectations regarding PharmAthene's ability to realize profits from the sale of ST-246 under a license agreement in accordance with the LATS[?]"[76] The Court of Chancery also acknowledged *SIGA I*'s observation that an award of lost profits "'presupposes that the plaintiff can prove damages with reasonable certainty.'"[77] Further, the Court of Chancery stated that "[w]hile proof of the fact of damages must be certain, proof of the amount can be an estimate, uncertain, or inexact."[78] The court additionally noted its ability to "take into account all the circumstances of the breach, including willfulness, in deciding whether to require a lesser degree of certainty, giving greater discretion to the trier of facts."[79] In addition to considering events that existed at

---

[76] *Id.* at *8.

[77] *Id.* at *7 (citing *SIGA I* at 351 n.99).

[78] *Id.* at *8 (quoting *Agilent Techs., Inc. v. Kirkland,* 2010 WL 610725, at *29 n.271 (Del. Ch. Feb. 18, 2010)); ROBERT L. DUNN, RECOVERY OF DAMAGES FOR LOST PROFITS § 1.3 (6th ed. 2005); WILLISTON ON CONTRACTS § 64:9 (4th ed. 2000) ("Thus, it is now well established that the uncertainty that prevents recovery is uncertainty as to the fact of damage and not as to its amount.").

[79] *Id.* (quoting *Cura*, 2001 WL 1334188, at *20 (internal citations omitted)); *Beard Research, Inc v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010) ("Public policy has led Delaware courts to show a general willingness to make a wrongdoer 'bear the risk of uncertainty of a damages calculation where the calculation cannot be mathematically proven.'") (quoting *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *23 (Del. Ch. Jan. 29, 2010)); RESTATEMENT (SECOND) OF CONTRACTS § 352 cmt. a (1981).

the time of the breach, the trial court took into account several post-breach developments "'to aid in its determination of the proper expectations at the time of the breach.'"[80]

The Court of Chancery then considered PharmAthene's claim for expectation damages by considering the parties' expectations and analyzing a damages calculation model prepared for the original trial by an experienced valuation expert, Jeffrey L. Baliban.[81] Baliban's report stated that PharmAthene retained him "to calculate the net present value of expected PharmAthene earnings from sales of the antiviral ST-246, had SIGA executed a license agreement in accordance with the terms of the LATS."[82] At trial, Baliban presented six variations of damages calculations. Noting *SIGA I*'s focus on the LATS as the appropriate yardstick for measuring damages, the court based its analysis on the "Basis 1 LATS Scenario," where "Baliban calculated PharmAthene's damages according to the terms of the LATS based on facts purportedly known as of December 20, 2006."[83] The court also considered some information from another variation of Baliban's calculations, the "Basic 2 LATS Scenario," which was still based

---

[80] *Id.* at *9 (quoting *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 17 (Del. Ch. 2003)). The Court of Chancery noted that "[f]or example, while it is appropriate to consider the fact that, to date, SIGA has sold 'X dollars' worth of ST-246 to evaluate whether at the time of the breach PharmAthene had a reasonable expectation of commercializing ST-246, it would be inappropriate to use 'X dollars' as the basis of a damages award because it was neither known nor knowable at the time of SIGA's breach." *Id.* at *9.

[81] *Id.* at *9–10. Baliban was a Senior Vice President in the Securities and Finance practice at National Economic Research Associates, Inc., a global economic consulting firm. The Court of Chancery observed that SIGA failed to present an alternative damages model, and instead was content to have its experts criticize PharmAthene's model.

[82] App. to Answering Br. at 1453 (Baliban's Report).

[83] Remand Opinion at *9.

on the LATS but used facts known as of November 2009, nearly three years after SIGA's breach.[84]

To determine the value to PharmAthene of a license for ST-246, Baliban used a discounted future earnings model to forecast earnings ten years into the future and then discounted them to their net present value at the time of the breach. As with any financial model, this required Baliban to make certain assumptions. A number of these assumptions were based on the PharmAthene Model, which was prepared by PharmAthene in early 2006 and used by the parties in their negotiations.[85] Specifically, Baliban used the PharmAthene Model's quantity and price projections for sales of ST-246 over a ten-year period from 2008 to 2017. He found that, over those ten years, PharmAthene would have sold approximately 91.9 million courses of the drug at $100 per course.

Baliban then deducted research and development costs, the costs of goods sold, and selling, general, and administrative expenses. The LATS did not address these expenses, and Baliban noted that the parties did not provide "any comprehensive analysis of costs and expense estimates or expected margins."[86] Thus, Baliban relied on "discussions with PharmAthene management personnel" and on "independent research supporting typical pharmaceutical costs and expenses" to come up with these figures.[87]

---

[84] *Id.* at *9 n.45.
[85] *Id.* at *10.
[86] App. to Answering Br. at 1473 (Baliban's Report).
[87] *Id.*

Once Baliban calculated ST-246's discounted future earnings, he incorporated the terms of the LATS before allocating the return generated from projected sales of ST-246 to the parties, noting in his report that:

> The LATS provided that, to the extent the net margin on sales to the U.S. Government exceeded 20 percent, such excess margin would be split 50-50 between PharmAthene and SIGA. The LATS also provided for license fees, milestone payments and royalties to be paid to SIGA in accordance with referenced amounts and timing schedules. We apply these rates to expected future ST-246 earnings . . . to yield the allocation of product earnings to PharmAthene and SIGA.[88]

He then applied an 84% probability of success factor to the total expected earnings from ST-246. Finally, he discounted the earnings to present value using PharmAthene's weighted average cost of capital.[89] This yielded a total payment due to PharmAthene of $1.07 billion.

The Court of Chancery scrutinized Baliban's assumptions and inputs to aid its own analysis of the parties' reasonable expectations at the time of breach. The court concluded that PharmAthene's expectations of ST-246's future prospects were informed by four primary factors: "(1) the likelihood that ST-246 ever would be sold commercially in meaningful quantities; (2) the timing of when any such sales would begin; (3) the price at which ST-246 would be sold; and (4) the quantity of ST-246 that would be sold."[90] For each of these factors, the court engaged in a careful and thorough analysis of how they affected the lost profits calculation.

---

[88] *Id.* at 1475.

[89] Because PharmAthene only had equity financing as of December 2006, the WACC rate was equivalent to PharmAthene's cost of capital. *Id.* at 1475–76.

[90] Remand Opinion at *10.

### a. The Likelihood That ST-246 Would Be Sold Commercially

The Court of Chancery took note of the facts established at the original trial and upheld by *SIGA I*: "SIGA's own confidence in ST-246's prospects, which caused it internally to value ST-246 at the time of the breach at between three and five billion dollars, and SIGA's development of 'seller's remorse' which ultimately motivated its bad faith conduct."[91] Based on this evidence, the court found that PharmAthene established that, at the time of SIGA's breach, the parties had a reasonable expectation that ST-246 would be commercialized in the near future. In other words, the Court of Chancery reasonably took into account that it was SIGA's increasingly bullish view of ST-246's prospects based on what was known in December 2006 that caused it to commit a breach to secure more of the drug's future value for itself than it would have had from a deal consistent with the terms of the LATS.

The trial court also noted that, even though SIGA was not awarded the BARDA contract until after the January 2011 trial, "the record supports a reasonable inference that [the parties] knew of BARDA's imminent establishment" at the time of SIGA's breach.[92] The Court of Chancery further observed that, at the time of the breach, the U.S. government had already established requirements for procuring pharmaceuticals for ST-246's target market, the National Stockpile, and that such requirements did not include FDA approval of the drug to be considered for acquisition.

---

[91] *Id.* at *11.

[92] *Id.*

The Court of Chancery then considered whether the 84% "probability of success" input used in Baliban's damages calculation was reasonable or unduly speculative.[93] That number was based on a report provided by PharmAthene's pharmaceutical expert, Dr. Carl Peck. Dr. Peck's report stated that, at the time of SIGA's breach, there was an 84% to 95% chance that ST-246 would obtain FDA approval; but a more than 95% chance that the drug would meet the criteria for purchase into the National Stockpile. The court considered the fact that PharmAthene had a reasonable expectation at the time of breach that ST-246 would be eligible for acquisition for the National Stockpile and hit certain milestones in 2006, such as "becoming the first drug to demonstrate 100% protection against the human smallpox virus in a primate trial [and] demonstrating protection against the monkey virus in two primate trials in November 2006."[94]

The Court of Chancery also noted that post-breach sales of ST-246 to BARDA showed that the drug was being sold to its intended purchaser, and that this demonstrated that the parties in 2006 had a reasonable expectation it would be successful. Finally, the court noted that these facts came on top of SIGA's own conduct and beliefs as to ST-246's promising prospects, which motivated its breach, so "PharmAthene was not alone in reasonably believing ST-246 imminently would be commercialized with great success."[95] Based on all of these factors, the Court of Chancery concluded that in December 2006, ST-246 had "a very high likelihood of being commercialized in the near

---

[93] *Id.*
[94] *Id.* at *12 n.57.
[95] *Id.* at *12.

future" and thus the "84% 'probability of success' factor was both reasonable and supported by the evidence."[96]

b. The Timing Of When Sales Of ST-246 Would Begin

Baliban used 2008 as the time when sales of ST-246 would begin. In response, SIGA pointed out that the first courses of the drug were not delivered until 2013. PharmAthene claimed that the parties used 2008 as the start date during their negotiations and that the delay in delivery was caused by SIGA's failure to develop the drug efficiently due to its lack of experience, whereas PharmAthene would have completed the process sooner. The Court of Chancery weighed the evidence and noted that, at the time of breach, there was no evidence as to *when* the drug might be procured for the National Stockpile. But, taking into account the "tremendous promise in preliminary studies, [which] enabled SIGA to raise over $20 million in development funding," and the fact that ST-246 was "granted 'orphan drug' and 'fast track' status by the FDA," all of which was known at the time of the breach, the Court of Chancery concluded that PharmAthene had a reasonable expectation that the U.S. government would start buying ST-246 for the National Stockpile by 2010, as opposed to 2008.[97]

c. The Price At Which ST-246 Would Be Sold

Baliban assumed that PharmAthene would sell ST-246 for $100 per course of treatment. PharmAthene claimed that this number was rooted in the parties' negotiations and that it was comparable to the price the U.S. government paid for other bioterrorism-

---

[96] *Id.*
[97] *Id.* at *13.

related countermeasures. The Court of Chancery noted that Baliban independently assessed the parties' use of the $100 per course price in their negotiations[98] and found that the price was consistent with the government's prior purchases. The court also took into account the fact that the post-breach BARDA contract "requires the government to pay *significantly* more than $100 per course."[99] On these bases, the Court of Chancery concluded that PharmAthene met its burden to show that it had a reasonable expectation at the time of breach that ST-246 would be commercialized at a price of $100 per course.

### d. The Quantity Of ST-246 That Would Be Sold

Analyzing the reasonable expectation at the time of breach of the quantity of ST-246 to be sold, the Court of Chancery considered Baliban's quantity inputs for three separate categories of sales: (1) sales to the National Stockpile; (2) sales to the DoD; and (3) sales outside of the U.S. to foreign nations.

### i. Sales Of ST-246 To The National Stockpile

Baliban used the sales projections in the PharmAthene model as a starting point to estimate the quantity of sales to the National Stockpile. PharmAthene calculated these sales by multiplying the size of the National Stockpile's smallpox vaccine stockpile by the percentage of the population contraindicated for the smallpox vaccine, which it assumed to be 5%. Because ST-246 was intended to help the percentage of the

---

[98] The parties used the $100 per course of treatment price point in their own negotiations because this price was incorporated into the PharmAthene Model which SIGA was comfortable using in negotiations before its breach, even though this price was "excessive" from SIGA's perspective. App. to Answering Br. at 1189 (Fasman Email).
[99] Remand Opinion at *14 (emphasis in original).

population that is contraindicated for the smallpox vaccine, the contraindication rate had a directly proportional effect on the quantity of sales to the National Stockpile. Although Baliban used the PharmAthene Model's quantity figure for National Stockpile sales, he increased those sales from 10,300,000 courses to 14,778,000 courses. He based this increase on an observation that the size of the National Stockpile was roughly equal to the size of the U.S. population in 2002. Baliban then assumed that the size of the National Stockpile in 2006 would be equal to the size of the U.S. population as of the July 1, 2005 U.S. Census Bureau estimate. Further, even though Baliban believed that, based on his research, the 5% contraindication rate used in the PharmAthene Model was understated; he kept the conservative 5% figure.

In assessing the reasonableness of these inputs, the Court of Chancery took account of the fact that the U.S. government was increasingly focused on bioterrorism counter-measures between 2002 and 2006 to conclude that it was reasonable that the size of the National Stockpile would continue to track the U.S. population during that time period, as opposed to decline as the PharmAthene Model assumed. As for the 5% contraindication rate, the court found it important that SIGA and PharmAthene appeared to incorporate this number in the projections used during negotiations. The court also noted that Baliban's research showed a contraindication rate of between 20% and 30%, so the 5% figure was a relatively conservative estimate.

Finally, the Court of Chancery addressed some of the criticisms presented by SIGA's damages expert, Dr. Keith Ugone. As a general matter, the court found Dr. Ugone's approach of challenging Baliban's assumptions to be largely unpersuasive,

33

stating: "Dr. Ugone's credibility was undermined by the fact that at trial he merely attempted to discredit Baliban's analysis without providing an alternative calculation of his own."[100] The court nonetheless still considered his criticisms.

Dr. Ugone criticized Baliban's calculation for failing to account for ST-246's competitors and the seven-year duration of the orphan drug status, explaining that these considerations would have materially reduced the quantity of National Stockpile sales as well as the time period during which those sales would have successfully been made. The Court of Chancery disagreed with these assertions on the basis that "[a]t the time of the breach, ST-246 [appeared] to have been 8,000 times more effective than its closest competing product" and that SIGA pointed to no evidence to suggest that ST-246's orphan drug status was the basis for the calculation's use of a ten-year time period.[101] The court also reasoned that any overstatement on these grounds was offset by the conservative contraindication rate and Baliban's use of a high discount rate of 23.1%. Based on these facts, the Court of Chancery found that PharmAthene proved with reasonable certainty that it had a reasonable expectation of the quantity of National Stockpile sales used in Baliban's model. Finally, the court allocated delivery of National Stockpile sales to five years instead of the four used in Baliban's model.

*ii. Sales Of ST-246 To The DoD*

---

[100] *Id.* at *16 n.78. The Court of Chancery noted that the court "has been critical of such an approach in the past." *Id.* (citing *Agilent*, 2010 WL 610725, at *29). The court further stated: "If the Court were to credit completely the testimony of Dr. Ugone, it would never be possible to award expectation damages in a case such as this one, no matter how much the underlying breach of contract could be attributed to the breaching party's bad faith." *Id.*
[101] *Id.* at *16.

The Court of Chancery noted that there was evidence in the record that the parties "projected that the [DoD] would purchase ST-246" although it acknowledged that those projections varied materially due to their different estimates of the size of the U.S. military population.[102] The court noted that it was unclear what PharmAthene used to come up with the estimate in the PharmAthene Model, but that Baliban again relied on U.S. Census data. The court found that Baliban's estimate of sales based on a military population size taken from the U.S. Census data was reasonable. But Baliban used a 10% contraindication rate for the military population, which the court rejected, finding that PharmAthene did not meet its burden of justifying why the higher rate was appropriate, and that it was reasonable to assume a 5% contraindication rate instead. The court ultimately found that, even if the parties' projections of sales "differed significantly," that both parties believed the DoD would buy ST-246. Based on the lowered contraindication rate, the court found that PharmAthene proved that "it had a reasonable expectation of selling approximately half of the quantities of ST-246 to the DoD that Baliban projected in his model."[103]

### iii. Foreign And Replacement Sales Of ST-246

Baliban's damages calculation assumed that foreign sales would be equal to National Stockpile sales. But the Court of Chancery noted that, although there was evidence of the prospect of sales to U.S. government agencies at the time of the breach, it was missing evidence to suggest material future sales to foreign countries. Further, the

---

[102] *Id.* at *17.
[103] *Id.*

court noted that there was no clear evidence presented at trial as to what criteria other countries would use to procure pharmaceuticals. Based on this lack of evidence, the court found that PharmAthene did not meet its burden to show that SIGA had a reasonable expectation at the time of breach of selling ST-246 to foreign nations.

Finally, the Court of Chancery addressed Baliban's assumption that "ST-246 had a shelf life of three to five years and . . . as a result, replacement purchases to replace courses that expired would occur every four years . . . ."[104] Dr. Ugone criticized this assumption on the grounds that there were too many uncertainties as to the U.S. government's future plans for the purchase of bioterrorism measures and that the more time passed, the higher the likelihood was that a competitor would enter the market. The Court of Chancery found these criticisms persuasive and found there was insufficient evidence that PharmAthene had a reasonable expectation of sales to the U.S. government nine years down the road.

*****

Based on its exhaustive and independent analysis of the four factors, the Court of Chancery required Baliban to make substantial adjustments to his model, most if not all of which benefitted SIGA, and held that PharmAthene met its burden of demonstrating it was entitled to lump-sum expectation damages. After Baliban submitted a revised damages calculation, on January 7, 2015, the Court of Chancery issued a Letter Opinion

---

[104] *Id.* at *18.

36

to address additional criticisms raised by SIGA's expert of the revised calculation.[105] In response to SIGA's criticisms, the court made two additional adjustments in SIGA's favor to the damages calculation. First, SIGA objected to Baliban reducing certain selling, general, and administrative expenses for the year 2006 in the revised calculation due to the December 20 date of SIGA's breach. Second, SIGA criticized Baliban's use of a "mid-year convention of discounting in calculating the present value of the relevant cash flows."[106] The court noted that both changes were departures from the methodology used in Baliban's original damages calculation and directed him to return to his previous assumptions. After making these final adjustments, the Court of Chancery awarded PharmAthene $113 million in contract expectation damages in a January 15, 2015 Final Order and Judgment.[107]

## IV. ANALYSIS

SIGA raises two primary issues on appeal—whether the law of the case doctrine precluded the Court of Chancery from revisiting its earlier determination that expectation damages were too speculative; and if not, whether the Court of Chancery should have found again on remand that lump-sum expectation damages were unavailable as too speculative. We review the Court of Chancery's law of the case determination *de*

---

[105] *Re: PharmAthene, Inc. v. SIGA Techs., Inc.*, 2015 WL 98901, at *1–2 (Del. Ch. Jan. 7, 2015) [hereinafter Letter Opinion].
[106] *Id.* at *1.
[107] Final Remand Order at *1.

*novo*.[108]  We review its damages determination for abuse of discretion, and will uphold its factual findings unless they are clearly erroneous.[109]

### A.    The Court of Chancery Did Not Err In Reconsidering Expectation Damages

SIGA argues that the law of the case bound the Court of Chancery on remand to its previous determination that lump-sum expectation damages were too speculative.  The Court of Chancery found otherwise, and held that *SIGA I* expressly instructed it to reconsider expectation damages.  We agree with the Court of Chancery's interpretation of *SIGA I*.

The law of the case doctrine, like *stare decisis*, "is founded on principles of efficiency, finality, stability and respect for the judicial system."[110]  Where the Supreme Court remands for further proceedings, "the trial court must proceed in accordance with the appellate court's mandate as well as the law of the case established on appeal."[111]

The law of the case doctrine did not require the Court of Chancery to follow its earlier decision ruling out expectation damages.  It would have been error to have done so because in *SIGA I* this Court remanded with the specific instruction to revisit damages, including expectation damages.  In *SIGA I*, when discussing PharmAthene's cross-appeal challenging the Court of Chancery's refusal to award lump-sum expectation damages as

---

[108] *Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26, 36 (Del. 2005).

[109] *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1212 (Del. 2012) (citing *William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2001)); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 715 (Del. 1983).

[110] *Cede*, 884 A.2d at 39 (citing *Gannett Co. v. Kanaga*, 750 A.2d 1174, 1181 (Del. 2000)).

[111] *Id.* at 38 (citing *Ins. Corp. of Am. v. Barker*, 628 A.2d 38, 40 (Del. 1993)).

speculative, this Court stated that it did not need to decide the issue and "reverse[d] the Vice Chancellor's damages award and remand[ed] for him to reconsider it in light of this opinion."[112] In other words, *SIGA I* remanded to the Court of Chancery to reconsider damages, which included the expectation damages now possible as a result of *SIGA I*.

Further guidance in *SIGA I* supports the Vice Chancellor's determination. *SIGA I* stated that the Court of Chancery was free to "reevaluate the helpfulness of expert testimony," which would be a meaningless statement if the court could not review expectation damages on remand.[113] *SIGA I* also clarified that expectation damages *were* possible with Type II agreements, and acknowledged that the Court of Chancery had been unable to award such damages because whether they were possible was, at the time, an unsettled legal question.[114] Further, *SIGA I* expressly overturned the Court of Chancery's prior finding that PharmAthene was entitled to damages based on a promissory estoppel theory, and directed the court to revisit damages under a contractual theory.[115]

On remand, the Court of Chancery was free to "make any order or direction in further progress of the case so long as it is not inconsistent with the decision of the appellate court, as to any question not settled by the decision."[116] Consistent with and as required by *SIGA I*, the Vice Chancellor revisited the damages award, including

---

[112] *SIGA I* at 353.
[113] *Id.*; Remand Opinion at *3.
[114] *SIGA I* at 350–52.
[115] *Id.* at 347–48.
[116] *Cede*, 884 A.2d at 39 (citing *Barker*, 628 A.2d at 41).

39

expectation damages, and therefore the law of the case was not a bar to reconsideration.[117]   The Vice Chancellor properly wrote on a clean slate when he reevaluated expectation damages.

B.   **The Court of Chancery Did Not Abuse Its Discretion In Finding That PharmAthene Met Its Burden To Show That Lump-Sum Expectation Damages Were Proper**

SIGA asserts that, regardless of law of the case, the Court of Chancery determined prior to remand that expectation damages were "speculative and too uncertain, contingent, and conjectural,"[118] and should have come to the same conclusion after remand.   It further argues that the court improperly relied on post-breach evidence because the same uncertainties noted by the court in its earlier decision were never resolved.   In the alternative, SIGA argues that the new evidence was insufficient to firm up the earlier uncertainties in calculating expectation damages.

PharmAthene responds that the Court of Chancery properly based its damages award on SIGA's reasonable expectations at the time of its breach, evidenced by SIGA's internal communications praising the company's successes and questioning the merger, and by the internal analysis prepared by Fasman for SIGA's senior officials, which valued the company as high as $5.6 billion.  PharmAthene also contends that the Court of Chancery properly considered post-breach facts for the limited purpose of determining the reasonableness of the parties' expectations at the time of SIGA's breach.  Finally, PharmAthene agreed with the Court of Chancery's analysis of the four primary drivers of

---

[117] Remand Opinion at *3–6; *SIGA I* at 353.
[118] Opening Br. at 22 (citing 2011 Opinion at *37).

40

its expectations of ST-246's prospects, except for the finding that PharmAthene did not establish foreign sales prospects with sufficient certainty.[119]

We emphasize the limited scope of appellate review of a damages award. Damages awards are reviewed for abuse of discretion.[120] Thus, "we do not substitute our own notions of what is right for those of the trial judge if that judgment was based upon conscience and reason, as opposed to capriciousness and arbitrariness."[121] We also will uphold the Court of Chancery's factual findings so long as they are not clearly erroneous.[122] The clearly erroneous standard applies to factual determinations based on credibility and the evidence.[123] Where there is more than one permissible determination to be drawn from the evidence, and the trial court chooses one, its finding cannot be clearly erroneous.[124]

### 1.  The Court Of Chancery Applied The Correct Legal Standard

SIGA argues as an initial matter that the Vice Chancellor should have simply followed his prior determination because expectation damages are difficult to measure for undeveloped products and new businesses, and especially so in the case of new drugs subject to regulatory approval.

---

[119] PharmAthene did not cross-appeal this finding in light of the abuse of discretion and clearly erroneous standards of review that apply to the Court of Chancery's decision.

[120] *Gatz*, 59 A.3d at 1212 (Del. 2012); *Weinberger*, 457 A.2d at 715 ("[The Court of Chancery has] broad discretion . . . to fashion such relief as the facts of a given case may dictate . . . .").

[121] *Gatz*, 59 A.3d at 1212 (quoting *William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2001)) (quotations omitted).

[122] *Id.* (citing *Cede*, 758 A.2d at 491); *Bank of N.Y. Mellon Trust Co. v. Liberty Media Corp.*, 29 A.3d 225, 236 (Del. 2011).

[123] *Bank of N.Y. Mellon Trust Co.*, 29 A.3d at 236.

[124] *Id.*

As a preliminary matter, and perhaps most significant, *SIGA I* directed the Court of Chancery to reconsider its damages award. *SIGA I* also instructed the Court of Chancery to reevaluate the helpfulness of expert testimony, and reconsider an award of lump-sum expectation damages in light of the opinion. These instructions were not ambiguous. *SIGA I* required the Court of Chancery to take a fresh look at the expert testimony in light of the clarified legal point that lump-sum expectation damages were available.

The Court of Chancery followed *SIGA I*'s mandate. First, it applied the correct legal standard to evaluate expectation damages. As this Court said in *Duncan v. Theratx, Inc.*:

> [T]he standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*. This principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract. Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promisee lost.[125]

The Court of Chancery recognized this Court's admonition in *SIGA I* that expectation damages must be proven with reasonable certainty, and "no recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative."[126] But it also confirmed what has been established by our courts—that certain presumptions apply when evaluating harm and loss. Where the injured party has proven the *fact* of damages—meaning that there would have been some profits from the

---

[125] 775 A.2d 1019, 1022 (Del. 2001) (footnotes omitted).
[126] 67 A.3d at 351 (quotations and citations omitted).

contract—less certainty is required of the proof establishing the *amount* of damages.[127]

In other words, the injured party need not establish the amount of damages with precise certainty "where the wrong has been proven and injury established."[128]

The Vice Chancellor found that PharmAthene firmly established the fact of damages. SIGA's breach caused PharmAthene to lose out on the opportunity to develop the vaccine, to enhance its reputation, and to access government funding to support continued drug development.[129] PharmAthene "was poised to commercialize profitably ST-246 in a way that it was reasonably certain would be profitable and . . . SIGA deprived it of that opportunity."[130] The Court of Chancery also applied the established presumption that doubts about the extent of damages are generally resolved against the breaching party. As a corollary to this presumption, the court noted it could take into account the willfulness of the breach in deciding whether to require a lesser degree of certainty.[131]

SIGA argues that the Court of Chancery applied the "wrongdoer rule" punitively, because it is only to those uncertainties caused by the breach that the presumption

---

[127] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010), *aff'd sub. nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010); *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002) (quoting *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992)).

[128] *Del. Express*, 2002 WL 31458243, at *17 ("Responsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages.").

[129] Remand Opinion *8 n.41.

[130] *Id.*

[131] *Id.* at *8 (citing *Cura*, 2001 WL 1334188, at *20 (citing RESTATEMENT (SECOND) OF CONTRACTS § 352 cmt. a (1981) ("A court may take into account all the circumstances of the breach, including willfulness, in deciding whether to require a lesser degree of certainty, giving greater discretion to the trier of the facts."))).

applies. SIGA is correct that the trial court did not have unbridled authority to dress up punitive damages as expectation damages by importing the willfulness of the breach into the damage award. And it is not every contract case where the court should assess the *bona fides* of the breaching party. But in a case about expectation damages caused by breach of a Type II agreement, where the wrongdoer caused uncertainty about the final economics of the transaction by its failure to negotiate in good faith, willfulness is a relevant factor in deciding the quantum of proof required to establish the damages amount.[132]

The Vice Chancellor applied the wrongdoer rule in a limited and proper way. For instance, as the Vice Chancellor found, if SIGA had negotiated in good faith under the

---

[132] Courts in Delaware and other jurisdictions have frequently applied the "wrongdoer rule" where the wrongdoer's breach contributed to uncertainty over the amount of damages. *See Duncan*, 775 A.2d at 1023 ("The intuition behind this rule is that the issuer-defendant should bear the risk of uncertainty in the share price because the defendant's acts prevent a court from determining with any degree of certainty what the plaintiff would have done with his securities had they been freely alienable.") (quotations omitted); *Agilent*, 2010 WL 610725, at *26–27 ("[I[n cases where a specific injury to the plaintiff cannot be established, the defendant's actual gain may be considered.") (citations omitted); *Beard*, 8 A.3d at 613; *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *963 (Del. Ch. Oct. 29, 1993); *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 10 (Del. Ch. 1992) ("[Because the acts of a wrongdoer defendant created uncertainties,] fundamental justice requires that, as between [the plaintiff] and [the defendant], the perils of such uncertainty should be 'laid at the defendant's door'") (quoting *Madison Fund, Inc. v. Charter Co.*, 427 F. Supp. 597, 608 (S.D.N.Y. 1977)); *Tanner v. Exxon Corp.*, 1981 WL 191389, at *2 (Del. Super. July 23, 1981) (citing 5 CORBIN ON CONTRACTS § 1020 (Rev. ed. 1969)); *see also Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 565 (1931) ("[W]hatever uncertainty there may be in this mode of estimating damages is an uncertainty caused by the defendants' own wrongful act; and justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced.") (quoting *Gilbert v. Kennedy*, 22 Mich. 117, 131 (1871)); *Boyce v. Soundview Tech. Grp.*, 464 F.3d 376, 391 (2d Cir. 2006) ("[W]here the existence of damage is certain, and the only uncertainty is as to its amount, . . . the burden of uncertainty as to the amount of damage is upon the wrongdoer.") (quotations and citations omitted); 17A AM. JUR. 2d *Contracts* § 611; RESTATEMENT (SECOND) OF CONTRACTS § 352 cmt. a (1981).

LATS, and the parties had executed a final agreement, there would have been no uncertainty about the research and development costs under the final license agreement.[133] The court resolved the uncertainties about those costs against SIGA. Where uncertainty could not be traced to SIGA's breach, the Court of Chancery did not resolve the uncertainty against SIGA. For example, the court rejected certain assumptions about foreign sales used in Baliban's model.[134] The court found that these assumptions were not supported by sufficient evidence and that it was "inappropriate to award lost profits on foreign sales because those sales were too speculative as of December 2006."[135] The court did not apply the wrongdoer rule to resolve all uncertainty against SIGA, where SIGA's breach was not the cause of the lack of information.

In addition, the LATS's core financial terms were not in dispute and did not have to be construed one way or the other. *SIGA I* stated that "[i]n this case, the Vice Chancellor made [the factual finding], supported by the record, [that] the parties memorialized the basic terms of a transaction in the LATS."[136] "[T]he LATS was intended to capture 'the key economic components' of any license agreement to which the two sides would agree regarding ST-246."[137] The Court of Chancery did not have to

---

[133] Remand Opinion at *14 n.67 ("Had SIGA negotiated in good faith, [the parties] would have reached a license agreement in which PharmAthene would have controlled ST-246's development and would have been in a position to know the exact amount of such cost figures.").

[134] *Id.* at *17.

[135] *Id.* at *17 n.84.

[136] *SIGA I* at 351. *SIGA I* also reiterated and affirmed that "but for SIGA's bad faith negotiations, the parties would have consummated a license agreement." *Id.*

[137] Remand Opinion at *5.

45

resort to the wrongdoer rule to construe the LATS's financial terms, which provided the framework for the court's damage award.

### 2. The Court Of Chancery Relied On Post-Breach Evidence For A Limited And Proper Purpose

The Court of Chancery correctly noted that "[u]nder Delaware law, the standard remedy for breach of contract is based on the reasonable expectations of the parties that existed before or at the time of the breach."[138] The court also properly acknowledged that PharmAthene must show that there would be some future profits, but after this showing, the amount of such profits may be an estimate.[139] SIGA does not dispute that the court could consider post-breach evidence when determining the reasonable expectations of the parties before or at the time of the breach.[140] Instead, SIGA argues that the Court of Chancery improperly used post-breach evidence "to cure the fatally

---

[138] *Id.* at *7 (citing *Duncan*, 775 A.2d at 1022 (Del. 2001)). The Court of Chancery noted:

> Proof of the fact of damages in a lost profits case means proof that there would have been some profits. If the plaintiff's proof leaves uncertain whether plaintiff would have made any profits at all, there can be no recovery. But once this level of causation has been established for the fact of damages, less certainty (perhaps none at all) is required in proof of the amount of damages. . . . [P]roof of the amount can be an estimate, uncertain, or inexact.

*Id.* at *8 (quoting *Agilent*, 2010 WL 610725, at *29 n.271 (citations omitted)). The court also accounted for the wrongdoer rule, noting:

> Doubts [about the extent of damages] are generally resolved against the party in breach. A party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred. *A court may take into account all the circumstances of the breach, including willfulness, in deciding whether to require a lesser degree of certainty, giving greater discretion to the trier of the facts.* Damages need not be calculable with mathematical accuracy and are often at best approximate.

*Id.* (citing *Cura*, 2001 WL 1334188, at *20) (emphasis in original).
[139] *Agilent*, 2010 WL 610725, at *29 n.271.
[140] Remand Opinion at *9.

speculative nature of the damages at the time of the breach."[141] The record does not support SIGA's argument.

The Court of Chancery recognized that post-breach evidence could be used "in order to aid in its determination of the proper expectations as of the date of the breach," but relied on such evidence "sparingly."[142] According to the court, it also limited the use of such evidence to the parties' expectations, and "in all other respects" determined that the post-breach evidence was "irrelevant" to measure expectation damages at the time of the breach.[143] We find after reviewing the record that the Court of Chancery properly limited the use of post-breach evidence to confirm its conclusions as to the parties' reasonable expectations at the time of breach, or used the evidence to adjust the damages award in SIGA's favor.

First, the Court of Chancery observed that even though SIGA did not secure the BARDA contract until after the 2011 trial, there was a reasonable inference that the

---

[141] Opening Br. at 33.

[142] Remand Opinion at *9 (citing *Comrie*, 837 A.2d at 17; *Cura*, 2001 WL 1334188, at *23–24 (considering evidence of post-breach transactions to calculate a damages award); *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F. Supp. 2d 459, 465 (D. Del. 2005)); *see also Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 697–98 (1933) ("The law will make the best appraisal that it can, summoning to its service whatever aids it can command. At times the only evidence available may be that supplied by testimony of experts. . . . But a different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within.") (citations omitted).

[143] Remand Opinion at *9.

parties knew this contract was imminent at the time of SIGA's breach.[144] The Court of Chancery also found ST-246's post-breach sale to BARDA supported its conclusion that PharmAthene had a reasonable expectation at the time of SIGA's breach that the U.S. government would contract to buy ST-246 in the near future, because the drug was actually sold to its intended buyer. These inferences supported ST-246's commercial viability at the time of SIGA's breach, including SIGA's own optimism and high valuation of the drug's prospects.[145]

SIGA's internal emails revealed that Vice President Konatich, Chief Scientific Officer, Hruby, and attorney Fasman, all questioned the need for a business collaboration with PharmAthene given the success of ST-246.[146] Additionally, Hruby's emails showed that government agencies were interested in a potential acquisition in the near future,[147] and that SIGA received over $21 million in grant money because agencies recognized the potential of ST-246.[148] SIGA also publicly announced the successful results of ST-246 in primate trials and was able to sell its stock at a premium following its positive developments. Additionally, PharmAthene was willing to consider giving SIGA more

---

[144] *Id.* ("Although officially BARDA did not come into existence until roughly contemporaneously with SIGA's bad faith conduct, the record supports a reasonable inference that both SIGA and PharmAthene knew of BARDA's imminent establishment.").

[145] The Court of Chancery specifically noted the facts of SIGA's "own confidence in ST-246's prospects, which caused it internally to value ST-246 at the time of the breach at between three and five billion dollars, and SIGA's development of 'seller's remorse' which ultimately motivated its bad faith conduct." *Id.*

[146] App. to Answering Br. at 807 (Email from Hruby to Konatich); *id.* at 1141 (Email from Fasman to Hruby).

[147] *Id.* at 1135 (Email from Hruby to Drapkin).

[148] *Id.* at 808 (Email from Hruby to Konatich).

favorable terms than those contemplated in the LATS,[149] likely because it recognized ST-246's potential for commercial success and because SIGA was balking at going forward because of its self-proclaimed view that ST-246 had a conservative value of $3 billion[150] and an optimistic value of $5.6 billion.[151] Based on these facts, there was substantial evidence, including post-breach information about the BARDA contract, that the parties had a reasonable expectation at the time of SIGA's breach that ST-246 would be commercialized in the near future.

Finally, the Court of Chancery noted that BARDA contracted to buy ST-246 for "significantly" more than $100 per course (SIGA is eligible to receive at least $180 per course under the contract) supported its conclusion that, at the time of SIGA's breach, PharmAthene had a reasonable expectation of commercializing ST-246 for $100 per course.[152] Although around the time of SIGA's breach, Fasman viewed PharmAthene's $100 per course of treatment price as "excessive" and assumed a price of $75,[153] SIGA was willing to continue negotiations based on the assumptions in the PharmAthene Model, which used the $100 figure.[154] According to Baliban's research, the $100 per course of treatment price was comparable to the price the U.S. government paid for similar pharmaceutical countermeasures.

---

[149] *Id.* at 1205 (Letter from Olstein to Coch).
[150] *Id.* at 1195.
[151] *Id.* at 1204 n.1 (Letter from Coch to Olstein).
[152] Remand Opinion at *14 n.66.
[153] App. to Answering Br. at 1189 (Fasman Email).
[154] *Id.* at 1195.

The fact that BARDA agreed to pay 80% more per course confirmed that the parties' expectations at the time of SIGA's breach were reasonable. Had the court given more weight to the post-breach BARDA contract, it could have concluded that the $100 price per course expectation at the time of breach was unreasonable for being too low. The Court of Chancery did not give undue weight to post-breach evidence, and properly limited the post-breach evidence to corroborate other facts establishing the expectation of the parties at the time of the breach.[155]

### 3. The Court Of Chancery Used The LATS Economic Terms To Determine Expectation Damages

SIGA argues that the Court of Chancery found in its 2011 Decision that the parties would have reached an agreement on terms substantially different from those set forth in the LATS. We read the 2011 Decision otherwise. The Vice Chancellor stated:

> I [] find that, but for SIGA's bad faith negotiations, the parties likely would have reached agreement on a transaction *generally in accordance with the LATS*. PharmAthene was willing to agree to a license agreement for ST-246 on terms that varied "to some extent" from the LATS. . . . Had SIGA engaged in good faith negotiations, I am convinced that a license agreement between PharmAthene and SIGA for ST–246 would have resulted in terms no less favorable to PharmAthene than the 50/50 profit split it already had mentioned and an increase in the upfront and milestone payments from a total of $16 million, as specified in the LATS to something in the range of $40 million.[156]

---

[155] SIGA also argues that the Court of Chancery "selectively and arbitrarily" considered the post-breach evidence, and supposedly "ignored" post-breach evidence that proved damages were speculative or should have been far less than awarded. Opening Br. at 35. The weighing of pertinent evidence is within the discretion of the trial court, and will not be second-guessed on appeal. *See Gatz*, 59 A.3d at 1212; *Bank of N.Y. Mellon Trust Co.*, 29 A.3d at 236; *Hudak v. Procek*, 806 A.2d 140, 150 (Del. 2002) ("The weight to be given to evidence . . . is for the trier of fact to determine.").

[156] 2011 Opinion at *38 (emphasis added).

Although the parties might have agreed to modifications of the LATS in SIGA's favor given ST-246's recent successes, had SIGA not breached its obligation to negotiate in good faith toward a license agreement in accordance with the LATS, fairly read the Vice Chancellor found that the parties would still have reached an agreement that was "generally in accordance with the LATS."[157] The financial terms of the LATS were a sufficiently certain basis to calculate damages, and the Court of Chancery did not err in rely on the LATS financial terms used by Baliban in his financial model.

SIGA also argues that the Court of Chancery deviated from the material financial terms of the LATS. Once again the record does not support SIGA's argument. The Court of Chancery used Baliban's Basis 1 damages calculation, which incorporated the LATS economic terms. After Baliban prepared a projection of ST-246's future profit using inputs from the PharmAthene Model as well as assumptions that were based on his research, he applied the key LATS economic terms to the calculation. That is, the license fees, milestone payments, and royalties PharmAthene owed SIGA were all applied to the calculation before earnings from ST-246 were allocated to the parties. Thus, the economic terms of the LATS were incorporated into Baliban's damages calculation, which served as the basis for the Court of Chancery's analysis of the damages award.

Furthermore, in its Remand Order, the Court of Chancery directed Baliban to apply the economic terms of the LATS to its calculation of damages and altered the timing of when certain upfront and milestone payments would have been made. The

---

[157] Id.

court gave SIGA the opportunity to comment on the revised calculations.[158] The Remand Order accounted for the license fee payments and the milestone payments, all of which PharmAthene owed to SIGA under the express economic terms of the LATS. Thus, the court's analysis in its Remand Opinion and its instructions in the Remand Order were based on the economic terms of the LATS.

### 4. The Court Of Chancery's Factual Findings Were Not Clearly Erroneous

The Court of Chancery took into account SIGA's own conduct and beliefs about ST-246's prospects before the breach, and painstakingly considered the relevant factors underlying Baliban's damages calculation. In evaluating the evidence, the Court of Chancery first took account of ST-246's successes and SIGA's own optimism about the drug's prospects. Specifically, it noted that the criteria for purchase into the National Stockpile was already known at the time of SIGA's breach, and the parties had a reasonable expectation that ST-246 would meet that criteria. It also noted that FDA approval was not one of the requirements for being considered for the National Stockpile, which weakened SIGA's argument that ST-246's prospects were too speculative because of the uncertainty of obtaining FDA approval. Had the parties truly believed that the success of the drug was premised on FDA approval, they would have been much more conservative in their valuations, and SIGA might not have walked away from the merger or a deal consistent with the LATS.

---

[158] Remand Order at *2 ("SIGA shall serve on PharmAthene any objections to the revised calculations within ten days of receiving . . . the calculations . . . . **The scope of these objections shall be limited to computational errors . . . .**") (emphasis in original).

Further, the Court of Chancery considered SIGA's damages expert's criticisms of Baliban's damages calculation and either found them wanting or made the requested adjustments. For example, SIGA's expert criticized Baliban's damages calculation for failing to consider competitors and failing to account for the seven-year duration of the "orphan drug" status. The court noted, however, that the 5% contraindication rate used in Baliban's model was conservative as compared to Baliban's independent research, which showed contraindication rates of between 20% and 30%.[159] Thus, the court reasoned that the shortcomings of Baliban's calculation were offset by the use of a conservative contradiction rate. It also noted that Baliban's use of a high discount rate of 23.1% compensated for these criticisms. The court considered and responded to SIGA's expert's criticisms, but could not rely on an alternative model for comparison because SIGA did not provide one. Also, in the January 7, 2015 Letter Opinion, the court directed Baliban to adhere to his original assumptions, which further reduced PharmAthene's damages award.[160] In this regard, it is worth noting that this is another instance where SIGA faults the Vice Chancellor for using a more conservative approach than he could have given the evidence. When it was deciding to breach, SIGA's internal valuation used a contraindication rate of 15%.[161] The Vice Chancellor would have been within his discretion to hold SIGA to its own contemporaneous estimate.

---

[159] App. to Answering Br. at 1468 (Baliban's Report).
[160] Letter Opinion at *1–2.
[161] App. to Answering Br. at 1200.

On top of the changes made in response to SIGA's expert, the Court of Chancery conducted its own analysis and adjusted Baliban's calculations. Specifically, the court changed the start date assumption for ST-246 sales, and adjusted the assumed sales to the National Stockpile, both in SIGA's favor. The court also found that PharmAthene did not prove that it had a reasonable expectation of commercializing ST-246 outside of the U.S. at the time of SIGA's breach. Additionally, the court lowered the contraindication rate for the military population from 10% to 5%, because PharmAthene failed to justify the higher rate. The court also amended PharmAthene's projected recognition of its milestone payment obligations under the LATS to reflect the new timing of ST-246 sales. These changes demonstrate that the Court of Chancery carefully analyzed the factors used in Baliban's model to avoid an excessive award. Ultimately, the court awarded PharmAthene $113 million in expectation damages—less than 11% of the $1.07 billion damages figure in Baliban's model.

SIGA is poorly positioned to argue that the parties' expectations about ST-246's prospects at the time of the breach were too speculative. At the time of the breach, SIGA internally valued ST-246 conservatively at $3 billion[162] and optimistically at $5.6 billion.[163] A letter from SIGA's attorney to PharmAthene's attorney stated that SIGA valued the drug at over $5 billion.[164] Right before the breach, ST-246 received $21.9 million in grant money from the National Institute of Allergy and Infectious Disease and

---

[162] *Id.* at 1189 (Fasman Email).
[163] *Id.* at 1195.
[164] *Id.* at 1204 n.1 (Letter from Coch to Olstein).

the National Institutes of Health to address SIGA's cash shortage, allowing SIGA to continue development of a drug that was demonstrating promise.[165] These grants reflected the organizations' confidence in ST-246, confirming SIGA's optimism about the drug's prospects. It was precisely because SIGA believed that ST-246 was worth $3 to $5.6 billion that it did not wish to share the upside with PharmAthene under LATS terms and why SIGA refused to consummate a final agreement.

SIGA is also poorly positioned to argue that profits were entirely speculative because ST-246 was an experimental drug. Both of these companies were in the business of developing pharmaceuticals for use against biological warfare. They understood that the government was a likely near-term purchaser.[166] SIGA confidently announced on July 13, 2006 that ST-246 was "its lead smallpox drug candidate" and that it had "successfully completed the first planned human clinical safety trial."[167] SIGA had met the scientific milestones for ST-246, and sought the bridge financing because of its confidence in the drug.[168] The additional government funding awarded to SIGA to complete development of ST-246 in September 2006 also undercuts SIGA's argument that this was merely an experimental drug.[169] This was not a situation where profits were entirely speculative—SIGA believed it was on the cusp of bringing ST-246 to market.

---

[165] *Id.* at 808 (Email from Hruby to Konatich); *id.* at 1135 (Email from Hruby to Drapkin).
[166] App. to Answering Br. at 1135 ("I presented to both DHS and DOD last week. They were very 'impressed' and indicated acquisitions in the future.").
[167] *Id.* at 811 (SIGA Press Release).
[168] *Id.* at 1135.
[169] *SIGA I* at 338.

We respectfully disagree with the dissent that PharmAthene should be limited to reliance damages, which, as the Court of Chancery found, would be no remedy at all for SIGA's bad faith breach.[170] Although the dissent characterizes SIGA I as "unclear," we find nothing unclear about the instructions from this Court to the Court of Chancery on remand. We instructed the court to determine anew whether expectation damages should be awarded, which included a specific instruction to reconsider the helpfulness of expert testimony directed to expectation damages. Further, faced with PharmAthene's argument that the court erred by failing to award lump-sum expectation damages, we "remand[ed] for him to reconsider it in light of [the SIGA I] opinion." The Court of Chancery followed this Court's mandate, painstakingly applied accepted principles of law to a detailed record, and exercised its broad discretion for a second time to fashion a damages remedy.[171]

The dissent's extended discussion of cases from other jurisdictions, including New York, and its fear of falling out of step with other leading commercial jurisdictions, suggests that its main dissatisfaction is with SIGA I and the rule it adopted permitting the recovery of expectation damages for bad faith breach of Type II agreements. We note, however, that despite SIGA's concerns about the precedent set in SIGA I, the decision is

---

[170] Remand Opinion at *5 n.29.

[171] The Court of Chancery crafted a remedy earlier in the case that was designed to eliminate uncertainty even more, by tying relief to a stream of royalties derived from sales. This Court in SIGA I never addressed whether that remedy was within Chancery's broad remedial discretion, and the dissent does not explain why that original remedy was incorrect.

56

the law of the case. Whether it was correctly decided was not raised by the parties and is not before us in this appeal.[172]

The Court of Chancery's opinion reflects a reasoned and thorough approach to evaluating the evidence underlying PharmAthene's damages claim. In view of our standard of review and of the evidence that was before the trial court, the Court of Chancery did not abuse its discretion or make conclusions that were clearly erroneous when it awarded PharmAthene lump-sum expectation damages on remand.

## V. CONCLUSION

The law of the case doctrine did not prevent the Court of Chancery from reconsidering its prior finding that lump-sum expectation damages were too speculative. Instead, the Court of Chancery was required to reevaluate the helpfulness of expert testimony and reconsider the damages award in light of *SIGA I*'s guidance. That is precisely what the Court of Chancery did. Further, the Court of Chancery did not abuse its discretion in finding that PharmAthene met its burden of proving its expectation damages with reasonable certainty, and the court's factual findings were not clearly erroneous.

The judgment of the Court of Chancery is affirmed.

---

[172] *See Gannett Co., Inc. v. Kanaga*, 750 A2d 1174, 1181 (Del. 2000) ("there must be some closure to matters already decided in a given case by the highest court of a particular jurisdiction, particularly when (with a different composition of jurists) that same court is considering matters in a later phase of the same litigation.").

**VALIHURA**, Justice, concurring in part and dissenting in part:

I concur with the Majority in part, and respectfully dissent in part.

I agree with the Majority's conclusion that the Court of Chancery's 2011 finding that expectation damages were "speculative and too uncertain, contingent, and conjectural"[1] is not the law of the case. Rather, as the Majority says, pursuant to our decision in *SIGA I*, the trial court was free to reconsider a damages award.[2] However, this Court also stated clearly in *SIGA I* that expectation damages must be proven with reasonable certainty.[3] No recovery can be had for damages that are "uncertain, contingent, conjectural, or speculative."[4] While it is not the law of the case, the Court of Chancery's reversal of its earlier finding that expectation damages here are "speculative and too uncertain, contingent, and conjectural,"[5] after examining essentially the same information as it had in 2011,[6] is the product of certain legal errors which, in turn, are perhaps the result of the remand instructions from this Court in *SIGA I*.[7]

---

[1] *PharmAthene, Inc. v. SIGA Techs., Inc.*, 2011 WL 4390726, at *37 (Del. Ch. Sept. 22, 2011) [hereinafter, "*PharmAthene I*, 2011 WL 4390726, at __"].

[2] *See SIGA Techs., Inc., v. PharmAthene, Inc.*, 67 A.3d 330, 351-52 (Del. 2013) (citation omitted) [hereinafter, "*SIGA I*, 67 A.3d at __"].

[3] *Id.* at 351 n.99.

[4] *Id.* (quoting *Callahan v. Rafail*, 2001 WL 283012, at *1 (Del. Super. Mar. 16, 2001)) (internal quotations omitted).

[5] *PharmAthene I*, 2011 WL 4390726, at *37.

[6] On remand from this Court's opinion in *SIGA I*, the Court of Chancery granted PharmAthene's motion to reopen the record. *See* Op. Br. Ex. A. (Tr. 33:21-24). The Court of Chancery indicated that it "relied only sparingly on post-breach information . . . ." *PharmAthene, Inc. v. SIGA Techs., Inc.*, 2014 WL 3974167, at *9 (Del. Ch. Aug. 8, 2014) [hereinafter, "*PharmAthene II*, 2014 WL 3974167, at __"]. At oral argument before this Court, counsel for PharmAthene confirmed that the only factual difference between the evidence before the Court of Chancery in 2011 and the evidence as supplemented by reopening the record on remand was the existence of a post-breach contract between SIGA and the federal government via the Biomedical Advanced Research and Development Authority ("BARDA"). *See* Videotape: Oral Argument Before the

As a preliminary matter, the Majority asserts that our scope of review of a damages award is "limited" and that "[d]amages awards are reviewed for abuse of discretion."[8] However, our review of embedded legal issues is *de novo*.[9] I disagree with the Majority's articulation of the standard of proof required for an award of expectation damages, its approval of the trial court's consideration of post-breach evidence, and its application of the "wrongdoer rule" to lessen the quantum of proof to the point of speculation and to broadly attribute to SIGA uncertainties in damages as the "but for" cause for failure to consummate a license agreement. Accordingly, I would reverse the trial court's decision, and I respectfully dissent as to those aspects of the Majority's Opinion.

## I.   THE LAW OF EXPECTATION DAMAGES

---

Delaware Supreme Court, at 26:06 (*SIGA Techs., Inc. v. PharmAthene, Inc.*, No. 20, 2015, October 7, 2015), *archived at* http://livestream.com/DelawareSupremeCourt/events/4404659/videos/101331469.

[7] In particular, this Court's direction to the trial court to reevaluate the helpfulness of expert testimony is not as clear as it perhaps could have been, as evidenced by the parties' briefs on appeal. *Compare* SIGA's Op. Br. at 29 ("And the Court of Chancery flatly misunderstood the significance of this Court's invitation to 'reevaluate the helpfulness of expert testimony.' That invitation was extended in the context of this Court's discussion of expert fee-shifting, and was limited to a reexamination of whether expert testimony was helpful in determining a damage award 'in light of this opinion'—an opinion that explicitly held that speculative damages cannot be awarded, and left untouched the Court of Chancery's original finding that expectation damages in this case are speculative.") (internal citations omitted), *with* PharmAthene's Ans. Br. at 26 n.12 ("Rather than affirm the Vice Chancellor's findings that expectation damages were too speculative, this Court instead ordered the Vice Chancellor to reconsider his award consistent with the Court's opinion and even encouraged him to 'reevaluate the helpfulness of expert testimony' in so doing.") (citation omitted).

[8] Maj. Op. at 41 (citations omitted).

[9] *See Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) ("Whether or not an equitable remedy exists or is applied using the correct standards is an issue of law and reviewed *de novo*.") (citations omitted).

Ordinarily, expectation damages are not awarded for the breach of a preliminary agreement due to difficulties in establishing such damages with sufficient certainty. As this Court acknowledged in *SIGA I*, "[n]o recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative."[10] The award of lump sum expectation damages in this case violates that basic principle—as the trial court correctly determined in the first instance. A review of the development of the law in the area of preliminary agreements provides a useful analytical backdrop for explaining why damages for breach of preliminary agreements are typically limited to reliance damages.[11]

### A. New York Develops a Conceptual Framework Regarding Preliminary Agreements

In 1987, Judge Leval of the United States District Court for the Southern District of New York observed in *Teachers Insurance & Annuity Association of America v. Tribune Co.*, that "[p]reliminary contracts with binding force can be of at least two distinct types."[12] He explained that one type "occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation."[13] The second "expresses mutual commitment to a contract on

---

[10] *SIGA I*, 67 A.3d at 351 n.99 (quoting *Callahan*, 2001 WL 283012, at \*1) (internal quotations omitted).
[11] *See, e.g.*, E. Allan Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations*, 87 COLUM. L. REV. 217, 267 (1987) ("[T]he appropriate remedy [for breach of a preliminary agreement] is not damages for the injured party's lost expectation under the prospective ultimate agreement but damages caused by the injured party's reliance on the agreement to negotiate.").
[12] *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987).
[13] *Id.*

agreed major terms, while recognizing the existence of open terms that remain to be negotiated."[14]

Two years later, in *Arcadian Phosphates, Inc. v. Arcadian Corp.*,[15] the United States Court of Appeals for the Second Circuit adopted Judge Leval's bifurcated framework for analyzing preliminary agreements. The Second Circuit has since applied this dual construction, observing that "binding preliminary agreements fall into one of two categories[,]"[16] either a Type I preliminary agreement or a Type II preliminary agreement.

As explained by the Second Circuit Court of Appeals, a Type I preliminary agreement exists "where all essential terms have been agreed upon in the preliminary contract, no disputed issues are perceived to remain, and a further contract is envisioned primarily to satisfy formalities."[17] Instruments of this type are "preliminary only in form," such that the parties only desire "a more elaborate formalization of the agreement. The second stage is not necessary; it is merely considered desirable."[18] Stated otherwise, Type I preliminary agreements are "fully binding," and are "created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document."[19] Type I agreements

---

[14] *Id.*

[15] 884 F.2d 69 (2d Cir. 1989).

[16] *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998); *see also Vacold LLC v. Cerami*, 545 F.3d 114, 124 (2d Cir. 2008) (quoting *Adjustrite*, 145 F.3d at 548).

[17] *Vacold*, 545 F.3d at 124 (quoting *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996)) (internal quotations omitted).

[18] *Tribune*, 670 F. Supp. at 498.

[19] *Vacold*, 545 F.3d at 124 (quoting *Adjustrite*, 145 F.3d at 548) (internal quotations omitted).

4

"render the parties fully bound to carry out the terms of the agreement even if the formal instrument is never executed."[20]

Type II preliminary agreements are commitments that are "binding only to a certain degree," as parties to such instruments "agree on certain major terms, but leave other terms open for further negotiation."[21] In other words, a Type II preliminary agreement is "a contract 'that expresses mutual commitment to a contract'" on certain agreed terms, with others to be negotiated.[22] In the context of a Type II preliminary agreement, the parties "recognize the existence of open terms, even major ones, but, having agreed on certain important terms, agree to bind themselves to negotiate in good faith to work out the terms remaining open."[23] However, Type II preliminary agreements "do[] not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework."[24] Therefore, a party to a Type II preliminary agreement "may only demand that [the] counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms. This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a

---

[20] *Id.* (quoting *Adjustrite*, 145 F.3d at 548) (internal quotations omitted).

[21] *Id.* (quoting *Adjustrite*, 145 F.3d at 548) (internal quotations omitted).

[22] *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 206 n.3 (2d Cir. 2002) (quoting *Tribune*, 670 F. Supp. at 498).

[23] *Vacold*, 545 F.3d at 124 (quoting *Dunk*, 84 F.3d at 77) (internal quotations omitted).

[24] *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005) (quoting *Adjustrite*, 145 F.3d at 548) (internal quotations omitted) (alterations in original).

5

reaching of final contract."[25]    However, a party to a Type II preliminary agreement is barred "from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement."[26]  Ultimately, "[i]f the parties 'fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation.'"[27]

This Court first applied New York's bifurcated approach to preliminary agreements in *SIGA I*.[28]    There, we held that plaintiffs who are party to a Type II preliminary agreement may recover *reasonably certain* expectation damages if "the trial judge makes a factual finding, supported by the record, that the parties would have reached an agreement but for the defendant's bad faith negotiations . . . ."[29]  *SIGA I* held that expectation damages are *theoretically* available, not definitively available, since our acknowledgement that a plaintiff might be entitled to recover expectation damages for breach of a Type II preliminary agreement was qualified by the associated footnote, which expressly stated that "[a]n expectation damages award presupposes that the plaintiff can prove damages with reasonable certainty."[30]  *SIGA I*, in that respect, does

---

[25] *Westerbeke*, 304 F.3d at 206 n.3 (quoting *Tribune*, 670 F. Supp at 498) (internal quotations omitted) (alternations in original).

[26] *Tribune*, 670 F. Supp. at 498.

[27] *Vacold*, 545 F.3d at 124 (quoting *Adjustrite*, 145 F.3d at 548) (internal quotations omitted).

[28] *SIGA I*, 67 A.3d at 349-51.

[29] *Id.* at 350-51.

[30] *Id.* at 351 n.99 (citing *Callahan*, 2001 WL 283012, at *1 ("It is well-settled law that 'a recovery for lost profits will be allowed only if their loss is capable of being proved, with a reasonable degree of certainty.  No recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative.'")).

not diverge from bedrock contract law establishing that reasonably certain proof is a predicate to an award of lost profits.[31]

Notably, the same New York courts that adopted and applied the distinction between Type I and Type II preliminary agreements disfavor awarding expectation damages in cases of a breach of a Type II preliminary agreement.[32] For example, in *Goodstein Construction Corporation v. City of New York*, a case decided after Judge

---

[31] *See* RESTATEMENT (SECOND) OF CONTRACTS § 352 (1981) ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with *reasonable certainty*.") (emphasis added), ch. 16, topic 2, § 352, cmt. a ("*Requirement of certainty.* A party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty. . . . The main impact of the requirement of certainty comes in connection with recovery for lost profits. . . . Although the requirement applies to damages based on the reliance as well as the expectation interest, there is usually little difficulty in proving the amount that the injured party has actually spent in reliance on the contract, even if it is impossible to prove the amount of profit that he would have made. In such a case, he can recover his loss based on his reliance interest instead of on his expectation interest."); 5 CORBIN ON CONTRACTS § 1020 (Rev. ed. 1964) ("In order to be entitled to a verdict, or a judgment, for damages for breach of contract, the plaintiff must lay a basis for a *reasonable estimate* of the extent of his harm, measured in money. This applies alike to harm that consists in losses suffered by the plaintiff (expenditures and other subtractions from his wealth) and to harm that consists in gains prevented by the breach.") (emphasis added), § 1022 ("[A] plaintiff who has been injured by a breach of contract frequently has a right to damages much greater in amount than the mere net profit that would have resulted from full performance; but such profits, when their amount *and* the fact that they have been prevented by the breach of the defendant can be proved with *reasonable certainty*, always form one of the elements in the damages that can be recovered.") (emphasis added); MODERN LAW OF CONTRACTS § 14:14 (2015) ("Although the value of lost profits and other consequential damages do not have to be proven with precision, the proof must be solid enough to justify a reasonable approximation by the trier of fact. Thus, *rules of certainty* and foreseeability apply *both* to proof of damage *and* to fact of damage.") (emphasis added), § 14:6 ("Proving breach is not enough to recover damages. There also must be proof of actual damages that flow from the breach. . . . There must be evidence of associated costs from which a finder of fact can determine the actual net loss—or a close approximation thereof—that resulted from the breach. Mathematical certainty is not required. 'Reasonable' certainty, which may be based upon probabilities and inferences, will suffice.") (citations omitted).

[32] *See Goodstein Constr. Corp. v. City of N.Y.*, 604 N.E.2d 1356, 1360-62 (N.Y. 1992); *see also 180 Water St. Assocs., L.P. v. Lehman Bros. Holdings, Inc.*, 7 A.D.3d 316, 317 (N.Y. App. Div. 2004) (citing *Goodstein*, 604 N.E.2d at 1360-61) (noting that a plaintiff claiming breach of an agreement to negotiate in good faith was limited to damages for out of pocket losses).

Leval's decision in *Tribune* and the Second Circuit's adoption of his analytical framework in *Arcadian Phosphates*, the New York Court of Appeals considered whether a plaintiff could recover damages in the amount of profits it might have earned in the event that a preliminary agreement to negotiate a final contract evolved into a complete instrument.[33] The court disallowed expectation damages under the circumstances,[34] reasoning that awarding such damages would require it to "transform[] an agreement to negotiate for a contract into the contract itself" and "give the injured party the benefit of the bargain that was not reached."[35] *Goodstein* reflects the general rule that "lost profits are not available where no agreement is reached, out-of-pocket costs incurred in the course of good faith partial performance are appropriate[.]"[36]

Although some federal cases in New York have awarded expectation damages for breach of preliminary agreements, those cases are distinguishable. In *Network Enterprises, Inc. v. APBA Offshore Productions, Inc.*,[37] for example, the parties entered into a fully enforceable contract for airtime to present ten telecasts of boat races. That contract incorporated an option to renew, which the court characterized as a Type II

---

[33] *Goodstein*, 604 N.E.2d at 1359-60.

[34] The *Goodstein* Court noted that the conclusion of a final agreement was far from certain because the City of New York had the ability to terminate the preliminary agreement. *Id.* at 1361. Here, by contrast, the Court of Chancery found that the LATS would have matured into a final agreement but for SIGA's breach. *PharmAthene I*, 2011 WL 4390726, at *38. Nevertheless, as discussed below, other factors present here contribute to the speculative nature of PharmAthene's asserted profits, including the revenue-based economic terms of the LATS. *PharmAthene II*, 2014 WL 3974167, at *4 n.20; *see* A352-53. Further, *Goodstein* involved the development of real property, the object of the LATS was to research, test, and market a new drug—an undertaking that embraces greater business risk and uncertainty.

[35] *Goodstein*, 604 N.E.2d at 1361 (internal quotations omitted) (citations omitted).

[36] *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 431 (2d Cir. 2011) (citing *Goodstein*, 604 N.E.2d at 1361) (citation omitted).

[37] 427 F. Supp. 2d 463 (S.D.N.Y. 2006), *aff'd*, 264 F. App'x 36 (2d Cir. 2008).

preliminary agreement to negotiate the "number, dates[,] and times" of the next season's telecasts in good faith and which contained a "limited" number of open terms.[38] The court, in view of the certainty of the damages calculus and the successful negotiating history between the parties, granted expectation damages by multiplying the fee per telecast set forth in the option by ten, as the option stated that the existing agreement would be renewed under "the same terms and conditions."[39]

Similarly, in *Teachers Insurance & Annuity Association of America v. Ormesa Geothermal*,[40] a borrower breached a commitment agreement it entered into with a lender to obtain a long-term loan. The agreement included "all of the crucial economic terms of the loan," including the principal, term, interest rate, security, repayment schedule, and penalties.[41] The open terms "were terms that customarily are left for later negotiation" between loan parties.[42] After the borrower breached the commitment agreement by insisting on a lower interest rate, the court awarded expectation damages to the lender in the amount as measured by the difference between the interest income it would have earned had the contract been performed and that it "would be deemed to have earned by timely mitigating its damages—*i.e.*, by making an investment with similar characteristics at the time of the breach."[43]

---

[38] *Id.* at 478, 485.
[39] *Id.* at 487.
[40] 791 F. Supp. 401 (S.D.N.Y. 1991).
[41] *Id.* at 414-15.
[42] *Id.* at 415.
[43] *Id.* at 416.

In *Network Enterprises* and *Ormesa Geothermal*, the terms left open in the preliminary agreements were limited to details of a logistical nature. These agreements allowed the courts to calculate damages based on the terms therein. Here, by contrast, the terms set forth in the LATS provided a "nuanced, revenue-based approach" to calculating royalties.[44] In addition, other payments would only be made upon the occurrence of certain milestones. A meaningful degree of speculation concerning the success of the project, the occurrence of various contingencies, and the extent of the ensuing profits, if any, would be required to ascertain the extent of PharmAthene's expectation damages.

In the context of a Type II preliminary agreement, lost profits damages, as a general rule, are inherently speculative. This case is no exception. Accordingly, I would hold that damages for SIGA's breach of its obligation to negotiate the license agreement in good faith are limited to PharmAthene's reliance damages.

## B. *The Majority Misapplies* **SIGA I** *and Now Places Delaware Out of Step with Other Major Commercial Jurisdictions*

This Court has imported New York's recognition of the binding force of preliminary agreements without adopting its concomitant limitations on expectation damages. Where parties have not established expectation damages to a reasonable certainty, limiting parties' damages for breach of a Type II preliminary agreement to reliance damages is necessary to prevent recovery in excess of the reasonable expectations of the parties at the time of breach. The Majority's decision, allowing non-reliance damages for breach of a Type II preliminary agreement absent sufficient

---

[44] *PharmAthene II*, 2014 WL 3974167, at *4 n.20; *see* A352-53.

10

evidence establishing such damages to a reasonable certainty, is a misapplication of *SIGA I*, which now places Delaware out of step with other important commercial jurisdictions.

*i.     New York Courts Disfavor Expectation Damages for Breach of a Preliminary Agreement*

As observed above, New York courts have hesitated to award expectation damages for the breach of a preliminary agreement, except in narrow cases where damages are ascertainable with reasonable certainty.[45] In *L-7 Designs, Inc. v. Old Navy, LLC*,[46] the United States Court of Appeals for the Second Circuit, in addressing the District Court's grant of a motion for judgment on the pleadings which rejected a claim for failure to negotiate a licensing agreement in good faith, commented that "[u]nder New York law parties who enter into binding preliminary agreements . . . 'accept a mutual

---

[45] *See, e.g.*, *Bulldog N.Y. LLC v. Pepsico, Inc.*, 8 F. Supp. 3d 152, 175 (D. Conn. 2014) ("In situations where a defendant has breached a Type II [a]greement by failing to negotiate in good faith, 'lost profits are generally not available where no agreement is reached, [but] out-of-pocket costs may still be appropriate.' . . . The only damages [that the plaintiff] appears to claim relate to its expected profits . . . which are unavailable for breach of a Type II agreement.") (citation omitted) (alterations in original and added) (applying New York law); *Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*, 765 F. Supp. 2d 403, 417 (S.D.N.Y. 2011) ("Although it is true that lost profits are generally not available where no agreement is reached, out-of-pocket costs may still be appropriate.") (citations omitted); *Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*, 519 F.3d 421, 429-30 (8th Cir. 2008) ("This is a difficult, largely unsettled question of remedies. . . . [But] we have no difficulty affirming the district court's decision that expectancy damages may not be recovered in this case. . . . The same reasoning [that applied in *Goodstein* for denying expectation damages] applies in this case. The Term Sheet was silent on significant issues . . . . The parties were not obligated to agree on these issues, nor can the missing terms be judicially determined by objective criteria in the Term Sheet itself or in commercial practice, usage, or custom. In effect, [the appellant] asks us to do what New York law prohibits— transform a binding preliminary agreement to negotiate for a contract into the contract itself.") (applying New York law). *Cf. Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*, 2015 WL 5671724, at *20 (S.D.N.Y. Sept. 22, 2015) ("The Court recognizes that the Second Circuit has explained that although out-of-pocket costs incurred in the course of good faith partial performance are appropriate, lost profits are not available where no agreement is reached.") (citing *L-7 Designs*, 647 F.3d at 431).

[46] 647 F.3d 419 (2d Cir. 2011).

commitment to negotiate together in good faith in an effort to reach final agreement . . . .'"[47] Consistent with the decisions noted above, it then observed that, "[a]lthough lost profits are not available where no agreement is reached . . . out-of-pocket costs incurred in the course of good faith partial performance are appropriate[.]"[48]

    *ii.      California Courts Disfavor Expectation Damages for Breach of a Preliminary Agreement*

California courts have consistently declined to award expectation damages for the breach of a preliminary agreement.[49] In *Copeland v. Baskin Robbins U.S.A.*,[50] the parties entered into a preliminary agreement regarding a Baskin Robbins plant, whereby "Copeland would purchase the plant's manufacturing assets and sublease the plant property. Baskin Robbins would purchase seven million gallons of ice cream from

---

[47] *Id.* at 430 (quoting *Tribune*, 670 F. Supp. at 498).

[48] *Id.* at 431 (citing *Goodstein*, 604 N.E. at 1361) (citation omitted). *See also ICBC (London) PLC v. Blacksands Pac. Grp., Inc.*, 2015 WL 5710947, at \*9 n.94 (S.D.N.Y. Sept. 29, 2015), *notice of appeal filed*, Oct. 23, 2015 (No. 15-3387) (citing *L-7 Designs*, 647 F.3d at 431) (observing that "lost profits are not available as a remedy for [breach of a Type II preliminary agreement]; recovery is limited to out-of-pocket costs incurred in partial performance of good faith negotiations").

[49] *See, e.g.*, *Advanced Thermal Scis. Corp. v. Applied Materials, Inc.*, 2010 WL 2015236, at \*52 (C.D. Cal. May 18, 2010) (discussing the uncertainty of lost profits damages and awarding reliance damages); *In re ECC Sys., Inc.*, 2009 WL 1028061, at \*2 (9th Cir. Apr. 17, 2009) (denying expectation damages in view of the fact that they were "not the reliance damages that under California law as set forth in [*Copeland v. Baskin Robbins U.S.A.*] are the *only* damages available for breach of a contract to negotiate an agreement") (emphasis added); *Original S.F. Toymakers, Inc. v. Trendmasters, Inc.*, 2003 WL 22384771, at \*7 (N.D. Cal. Oct. 7, 2003) ("The appropriate remedy for a breach of an agreement to negotiate are those damages which the plaintiff incurred in reliance on the defendant to negotiate in accordance with the covenant of good faith and fair dealing implied in every contract. This measure includes the 'plaintiff's out of pocket costs in conducting the negotiations' but may not include 'lost expectations (profits).'") (internal citations omitted); *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 962 (9th Cir. 2001) (affirming the denial of expectation damages in connection with a preliminary agreement on the grounds that any such award would require "impermissible speculation").

[50] 117 Cal. Rptr. 2d 875 (Cal. Ct. App. 2002).

12

Copeland over a three year period."[51] The agreement was contingent upon the ice cream purchase arrangement, referred to as a "co-packing" agreement, which the parties understood to be a material aspect of the deal.[52] "Among the issues to be settled were the price Baskin Robbins would pay for the ice cream, the flavors Copeland would produce, quality standards and controls, who would bear the loss from spoilage, and trademark protection."[53] However, Baskin Robbins later wrote to Copeland, explaining that "'the proposed co-packing arrangement [was] out of alignment with [its] strategy.' Therefore, Baskin Robbins informed Copeland, 'we will not be engaging in any further negotiations of a co-packing arrangement.'"[54]

In a suit for breach of contract, Copeland alleged that the preliminary agreement "constituted a contract to negotiate the remaining terms of the co-packing agreement and Baskin Robbins breached this contract by refusing without excuse to continue negotiations or, alternatively, by failing to negotiate in good faith."[55] The court, however, observed that "[a]rguing bad faith is an uncertain concept which could cost the defendant millions of dollars in expectation damages [and] is also without merit. . . . [T]he appropriate remedy for breach of a contract to negotiate is not damages for the injured party's lost expectations under the prospective contract but damages caused by the injured party's reliance on the agreement to negotiate."[56] Accordingly, the court held

---

[51] *Id.* at 877.
[52] *Id.*
[53] *Id.* at 878.
[54] *Id.*
[55] *Id.* at 880.
[56] *Id.* at 883 (citation omitted).

that "damages for breach of a contract to negotiate an agreement are measured by the injury the plaintiff suffered in relying on the defendant to negotiate in good faith. This measure encompasses the plaintiff's out-of-pocket costs in conducting the negotiations and may or may not include lost opportunity costs. The plaintiff cannot recover for lost expectations (profits) because there is no way of knowing what the ultimate terms of the agreement would have been or even if there would have been an ultimate agreement."[57]

### iii. Other Jurisdictions Disfavor Expectation Damages, Particularly in the Pharmaceutical Context

Particularly in the pharmaceutical context, the courts of other jurisdictions appear to disfavor expectation damages.[58] In *AlphaMed Pharmaceuticals Corp. v. Arriva Pharmaceuticals, Inc.*,[59] in the context of a patent infringement suit, the United States District Court for the Southern District of Florida observed that "only a minuscule percentage of drugs in development ever reaches the commercial market—and of those, only a subset ever prove profitable for their manufacturer. Accordingly, reliance on a multitude of assumptions is endemic to any valuation of the prospective profitability of

---

[57] *Id.* at 885 (citations omitted). Notably, in *PharmAthene I*, the trial court found that "the parties did not intend the LATS as attached to [the Bridge Loan Agreement and Merger Agreement] to be a binding license agreement or to require that any later formal agreement include exactly the same terms as the LATS." *PharmAthene I*, 2011 WL 4390726, at *16. But, on remand, the trial court observed that this Court's opinion in *SIGA I* "place[d] greater weight on the terms specified in the LATS than [it] afforded those terms in determining [the] prior damages award." *PharmAthene II*, 2014 WL 3974167, at *4.

[58] *See, e.g.*, *PharmaNetics, Inc. v. Aventis Pharms., Inc.*, 2005 WL 6000369, at *12, *16 (E.D.N.C. May 4, 2005), *aff'd*, 182 F. App'x 267 (4th Cir. 2006) (affirming exclusion of expert testimony and noting that there was "no clear error in ruling the new technology's lost sales to be too speculative").

[59] 432 F. Supp. 2d 1319 (S.D. Fla. 2006), *aff'd*, 294 F. App'x 501 (11th Cir. 2008).

14

new pharmaceutical products."[60] In view of the intrinsic unpredictability underlying the development of pharmaceuticals, the District Court noted that "inherent uncertainty makes the recovery of lost profits for anticipated sales of a new drug exceedingly difficult."[61]

In *Microbix Biosystems, Inc. v. BioWhittaker, Inc.*,[62] the United States District Court for the District of Maryland, in the antitrust context, found that a plaintiff's request for lost profits related to the production of a pharmaceutical ranging between $60 and $95 million, even before trebling, was too speculative. In so holding, the District Court stated that "for the damages to be of the amount claimed (or any amount for that matter), one must assume that [the p]laintiff would have successfully secured a manufacturing facility, obtained FDA approval, developed the [drug's essential protein enzyme] in commercial quantities, and marketed the product during the relevant time frame."[63] Because the court concluded that the plaintiff failed to present evidence of damages "with a sufficient degree of certainty," it granted summary judgment.[64]

---

[60] *Id.* at 1345 (internal citation omitted). *See also Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (explaining that under New York law, "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate") (citing *Kenford Co., Inc. v. Erie Cnty.*, 493 N.E.2d 234, 235 (N.Y. 1986)).

[61] *Id.* at 1346. In *AlphaMed*, the plaintiff failed to prove the fact of damages, *i.e.*, that it would have earned a profit (of any amount) but for the defendant's conduct.

[62] 172 F. Supp. 2d 680 (D. Md. 2000), *aff'd*, 11 F. App'x 279 (4th Cir. 2001).

[63] *Id.* at 698.

[64] *Id.* at 699.

Further, this Court has recognized the desirability of maintaining symmetry of laws in important areas.[65] In *SIGA I*, we acknowledged that there were two enforceable, relevant contracts. We stated that "[t]he promise to negotiate in good faith for a definitive license agreement in accordance with the LATS's terms [was] expressly included in both the Bridge Loan and Merger Agreements."[66] The Bridge Loan Agreement was governed by New York law[67] and the Merger Agreement was governed by Delaware law.[68] The asymmetry between New York and Delaware law, now enhanced by the Majority's Opinion, is undesirable, particularly since it is common for financing agreements to be governed by New York law, and for merger and other related transaction agreements to be governed by Delaware law.

## II. ERRONEOUS RELIANCE ON POST-BREACH EVIDENCE

The Court of Chancery erroneously looked to post-breach evidence to determine what the parties' expectations were at the time of the breach seven years earlier. Such evidence included the award of the BARDA contract in 2011, several years after the breach, despite the reality that BARDA is a government agency that did not come into existence until the day before the breach. The trial court then decided that sales of ST-246 would have begun in 2010, ignoring the undisputed fact that it was first delivered in

---

[65] *See Stewart v. Wilmington Trust SP Servs., Inc.*, 2015 WL 6672222, at *2 (Del. Nov. 2, 2015) (discussing the beneficial impact of synchronizing laws of "sister states, such as New York, whose laws are often involved in situations involving Delaware corporations"). Harmonizing the laws of sister states is useful where, as here, we adopt a portion of the sister state's law as our own.

[66] *SIGA I*, 67 A.3d at 348.

[67] A147 (Bridge Loan Agreement § 7.11).

[68] A273 (Merger Agreement § 13.5).

16

2013. Further, in the model adopted by the Court of Chancery, the calculation of damages is extremely sensitive to changes in the timing of ST-246 sales.[69]

Uncertainty with respect to the success of the project, the occurrence of contingencies, and the extent of the profits to be gained, if any, were the basis of the Court of Chancery's 2011 determination that calculating expectation damages was "speculative and too uncertain, contingent, and conjectural."[70] As the Court of Chancery then ruled, the *fact* of damages was even uncertain: "The evidence adduced at trial proved that numerous uncertainties exist regarding the marketability of ST-246 and that it remains possible that it will not generate any profits at all."[71] The following chart illustrates that the trial court's consideration of post-breach evidence reversed this important conclusion:

| The trial court's view in 2011 of the *fact* of damages | The trial court's consideration of post-breach evidence | The trial court's 2014 view of the *fact* of damages |
|---|---|---|
| "The evidence adduced at trial proved that numerous uncertainties exist regarding the marketability of ST-246 and that it remains possible that it will not | "[S]ince I issued the Post-Trial Opinion, SIGA has been awarded a contract to sell ST-246 to the United States government via BARDA. The parties dispute the extent to which I can and should | "Having considered the competing arguments and relevant case law, I have decided that this Court should take note of SIGA's success in procuring a contract with BARDA (*i.e.,* its actual commercialization of ST- |

---

[69] In 2011, by contrast, the trial court had found that "[t]he disparity of outcomes between, on the one hand, the Basis I and 2009 Basis II models and, on the other hand, the 2010 Basis II model highlights the inherently speculative nature of Baliban's damages calculations." *PharmAthene I*, 2011 WL 4390726, at *37 n.224 ("With the benefit of slightly more current information, PharmAthene's estimated damages diminished by over $600 million, or more than 50%."). The trial court, specifically, had found Baliban's analysis to be too speculative due to its sensitivity to the timing of sales. *See id.* ("[W]ere sales to commence one year later than assumed . . . the ultimate damages amount would decrease by over $90 million, a decrease of over 20%.").

[70] *Id.* at *37.

[71] *Id.*

17

| | | |
|---|---|---|
| generate any profits at all."[72] | consider an event such as this, which occurred several years after SIGA's bad faith breach."[73] | 246). In particular, that fact mitigates or possibly eliminates some of the concerns I expressed in the Post-Trial Opinion regarding ST-246's future prospects, including the possibility that the drug might not generate any profits at all."[74] |

That the Court of Chancery came to the opposite conclusion in 2014 suggests that it gave undue weight to evidence of ST-246's performance in the intervening years. The future performance of ST-246 could not have been known to the parties at the time of breach.

The Majority holds that the Court of Chancery properly "recognized that post-breach evidence could be used 'in order to aid in its determination of the proper expectations as of the date of the breach,' but relied on such evidence 'sparingly.'"[75] Yet, the chance in 2006 of an event occurring years later is not altered by subsequent knowledge that the event did or did not occur.

Moreover, consideration of post-breach information in the chart below—although this is admittedly "20/20 hindsight"—only illustrates the speculative nature of PharmAthene's claimed expectation damages and highlights the unreliability of crafting an award of damages based on the expectations of parties in cases such as this:

---

[72] *Id.*

[73] *PharmAthene II*, 2014 WL 3974167, at *6.

[74] *Id.* (citation omitted).

[75] Maj. Op. at 47 (citing *PharmAthene II*, 2014 WL 3974167, at *9).

18

| Court of Chancery Factors[76] | PharmAthene's 2006 and 2009 Assumptions[77] | Eventual Result[78] |
|---|---|---|
| The likelihood that ST-246 would be sold commercially. | 84% probability of FDA approval, forecasted to occur in 2012. | No FDA approval, and no indication of when or if FDA approval will occur. |
| When such sales were likely to begin. | Between 2008 and 2011. | First delivery in 2013. |
| The price at which ST-246 would be sold. | $100 per course[79] | At least $180 per course[80] under the BARDA contract. |
| The quantity of ST-246 that would be sold. | Sales to the Strategic National Stockpile of between 14.778 million and 18.9 million courses of treatment; sales to the Department of Defense of between 250,490 and 600,460 courses of treatment; and sales to the rest of the world of between 14.778 million to 17.2 million courses of treatment. | 1.7 million courses of treatment under the BARDA contract;[81] no sales to the Department of Defense; and no sales to the rest of the world. |

The Court of Chancery recognized in 2011 that expectation damages were likely speculative because the legislation enacting BARDA was less than a day old at the time of breach and "predictive models for regulatory success [were] difficult to come by for ST-246 both because there [were] no other treatments for smallpox to compare it to and

---

[76] *PharmAthene II*, 2014 WL 3974167, at *10-18.

[77] Unless otherwise indicated, these figures are drawn from the assumptions made by PharmAthene expert Jeffrey L. Baliban in his "Basis I" and "Basis II" damages estimates. Baliban conducted a discounted future earnings analysis on two different bases, "forecasting over a ten-year period the earnings PharmAthene would have received under a license for ST-246 consistent with the terms of the LATS. . . . Basis I employed data inputs derived from information the parties knew as of December 2006, and Basis II updated those inputs to account for new information the parties had learned as of a date shortly before trial." *PharmAthene I*, 2011 WL 4390726, at * 36. The trial court, on remand, considered some information from the Basis II scenario, using facts known as of November 2009—almost three years post-breach. *PharmAthene II*, 2014 WL 3974167, at *9 n.45. SIGA's expert, Keith R. Ugone, opined in his 2009 expert report that an 84% probability of success was "too high," and that, in view of the "developmental stage and regulatory uncertainties associated with ST-246," forecasted sales beginning in 2008 under Basis I and 2010 under Basis II were "highly uncertain and unreasonable." AR613-14.

[78] The eventual result is current as of December 2013. *See* A808.

[79] *PharmAthene II*, 2014 WL 3974167, at *14.

[80] *Id.* at *14 n.66.

[81] *PharmAthene II*, 2014 WL 3974167, at *12.

very few drugs have been approved under the Animal Efficacy Rule[.]"[82]  Also, based upon the trial record, the Court of Chancery in 2011 denied expectation damages as impermissibly speculative in part because "ST-246 might [have] never receive[d] FDA approval, there [were] no guaranteed purchasers of ST-246, and research delays or problems in animal trials might [have] prevent[ed] ST-246 from reaching a viable market in a timely fashion[,]"[83] and, as of April 2010, "no final contract with BARDA yet existed."[84]  I believe that the trial court's reliance on post-breach evidence to resolve uncertainties that it had previously ruled were fatally speculative was error.

## III.  THE WRONGDOER RULE

The Court of Chancery relied on the so-called "wrongdoer rule" to resolve, or compensate for, uncertainties in establishing damages payable by SIGA.  In doing so, the Court of Chancery erroneously used SIGA's breach of its duty to negotiate a commercial contract in good faith as a basis to relieve PharmAthene of its duty to prove non-speculative damages.

While I agree with the Majority's conclusion that the *fact* of damages must be proven with reasonable certainty, I disagree with its holding that the *amount* of damages does not have to be proven with reasonable certainty.[85]  Here, the Majority observes that

---

[82] *PharmAthene, Inc. v. SIGA Techs., Inc.*, 2010 WL 4813553, at *11 n.64 (Del. Ch. Nov. 23, 2010).

[83] *PharmAthene I*, 2011 WL 4390726, at *31.

[84] *Id.* at *37 n.224.

[85] *See Cole v. Homier Distrib. Co., Inc.*, 599 F.3d 856, 864 (8th Cir. 2010) ("[A] plaintiff in a contract action generally has the burden of proving 'the existence *and* amount of . . . damages with reasonable certainty.") (citation omitted) (emphasis added); *Schonfeld*, 218 F.3d at 172 ("In an action for breach of contract, a plaintiff is entitled to recover lost profits only if he can

where the *fact* of damages has been proven, less certainty is required to establish the *amount* of damages. It then adds that "where the wrongdoer caused uncertainty about the final economics of the transaction by its failure to negotiate in good faith, willfulness is a relevant factor in deciding the quantum of proof required to establish the damages amount."[86] Even if mathematical precision is not required to establish the amount of damages and even if reasonable estimates are permissible, I believe the Majority understates the level of certainty required for an award of expectation damages,[87] and then compounds the error by relying on the wrongdoer rule to lessen the burden of proof and sanction an award of speculative damages.

As we said in *SIGA I*, lost profits damages must be proved with reasonable certainty.[88] "The general rule, followed in Delaware law and elsewhere, is that future lost profits must be established by 'substantial evidence' and not by speculation."[89] Thus,

---

establish *both* the existence *and* amount of such damages with *reasonable certainty*.") (citing *Kenford Co.*, 493 N.E.2d at 235) (emphasis added); *Summit Props. Int'l, LLC v. Ladies Prof'l Golf Ass'n*, 2010 WL 2382405, at *2 (S.D.N.Y. June 14, 2010) ("In order to recover loss of future profits as damages for breach of contract under New York law, the plaintiff must establish the existence *and* the amount of lost profits with *reasonable certainty* . . . .") (citing *Schonfeld*, 218 F.3d at 173) (emphasis added); *Am. Commc'ns Network, Inc. v. Steuben Assocs.*, 2005 WL 1355070 (E.D. Mich. Apr. 5, 2005) ("In general, damages must be proved by the plaintiff by establishing *both* the existence *and* amount of such damages with *reasonable certainty*.") (citation omitted).

[86] Maj. Op. at 44 (collecting cases).

[87] *See* 5 CORBIN ON CONTRACTS § 1022 (Rev. ed. 1964) ("[T]he term 'speculative and uncertain profits' is not really a classification of profits, but is instead a characterization of the evidence that is introduced to prove that they would have been made if the defendant had not committed a breach of contract. The law requires that this evidence shall not be so meager or uncertain as to afford no reasonable basis for inference . . . .").

[88] *SIGA I*, 67 A.3d at 351 n.99. *See also Chrysler Corp. v. Quimby*, 144 A.2d 123, 139 (Del. 1958).

[89] *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *29 n.271 (Del. Ch. Feb. 18, 2010) (quoting *Mobile Diagnostics, Inc. v. Lindell Radiology, P.A.*, 1985 WL 189018, at *4 (Del.

21

while estimates are permissible, the calculus for such estimates must exclude evidence founded upon speculation or conjecture, and rely, instead, on reasonably certain evidence which enables the factfinder to determine estimated expectancy damages.

Accordingly, I believe that the trial court's and the Majority's application of the wrongdoer rule to compensate for the lack of requisite certainty is error. The Majority, for example, relies on *Beard Research, Inc. v. Kates*[90] for the proposition that if the plaintiff can prove the *fact* of damages with reasonable certainty, the *amount* of damages can be an estimate that is not reasonably certain.[91] *Beard Research* is distinguishable, in that the case involved misappropriation of trade secrets, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, tortious interference with contractual relations, and tortious interference with prospective business relations. That is to say, *Beard Research* was not a case that centered on a breach of contract, let alone a breach of a preliminary agreement. "Courts have traditionally required greater certainty in the proof of damages for breach of a contract than in the proof of damages for a tort."[92] In *SIGA I*, we instructed that the trial court "must look to the contract as the source of a remedy on the breach of an obligation to negotiate in good faith."[93] Further, while the *Beard*

---

Super. July 29, 1985) ("The general rule is that loss of future profits must be established by substantial evidence and can't be left to speculation."); *Re v. Gannett Co., Inc.*, 480 A.2d 662, 668 (Del. Super. 1984), *aff'd*, 496 A.2d 553 (Del. 1985) ("Courts have required that loss of future profits be established by substantial evidence and not be left to speculation.") (internal citations omitted)).

[90] *Beard Research, Inc. v. Kates*, 8 A.3d 573 (Del. Ch. 2010), *aff'd sub. nom.*, *ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010).

[91] Maj. Op. at 4, 25, 43, 44.

[92] RESTATEMENT (SECOND) OF CONTRACTS ch. 16, topic 2, § 352, cmt. a (1981).

[93] *SIGA I*, 67 A.3d at 348.

22

*Research* court observed that "'[t]he quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage[,]'"[94] the court's immediately succeeding qualifier with respect to the required certainty of damages states: "Nevertheless, when acting as the fact finder, [the Court of Chancery] may not set damages based on mere 'speculation or conjecture' where a plaintiff fails to adequately prove damages."[95]

The Majority relies upon *Delaware Express Shuttle, Inc. v. Older*[96] for the same proposition. Like *Beard Research*, *Delaware Express* involved claims of misappropriating trade secrets and breach of fiduciary duties, in addition to claims with respect to breach of a non-competition agreement, defamation, and tortious interference with existing and prospective business relationships. The plaintiff sought injunctive relief as well as damages. The court entered an injunction and awarded damages of "only $6,000."[97] As in *Beard Research*, the Court of Chancery acknowledged in *Delaware Express* that "[t]he law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of

---

[94] *Beard Research*, 8 A.3d at 613 (citation omitted) (alteration in original).

[95] *Id.* (quoting *Medek v. Medek*, 2009 WL 2005365, at *12 n.78 (Del. Ch. July 1, 2009)). The Majority also cites to 24 WILLISTON ON CONTRACTS § 64:9 (4th ed. 2000) for the proposition that "it is now well established that the uncertainty that prevents recovery is uncertainty as to the fact of damage and not as to its amount." Williston's immediately succeeding qualifying language, however, provides: "In other words, where substantial damage has been suffered, the impossibility of proving its *precise amount* provides no basis for denying the recovery of substantial damages altogether." *Id.* (citations omitted). Indeed, damages need not be denied merely because the plaintiff cannot establish their exact amount, but that is not to say, as the Majority suggests, that damages may be awarded based on speculative estimations.

[96] 2002 WL 31458243 (Del. Ch. Oct. 23, 2002).

[97] *Id.* at *1.

23

damages."[98]   But, in the immediately succeeding sentence, the court reiterated that "[s]peculation is an insufficient basis" for an award of damages.[99]   Further, the court rejected the plaintiff's argument that any uncertainties must be resolved against the defendants as wrongdoers.[100]

This Court's decision in *Duncan v. Theratx, Inc.*[101] illustrates that uncertainties not attributed to the wrongdoer in a breach of contract case should be excluded from the damages calculus.   There, the defendant's breach of a merger agreement caused a temporary restriction on the ability of certain stockholders to sell their shares.   The uncertainty in calculating damages—"'what the plaintiff[s] would have done with [their] securities had they been freely alienable'"—was caused by the breach.[102]   The court calculated damages based upon the difference between the "highest intermediate price" achieved while the restriction was in effect and the average price during the period immediately after the restriction was lifted, in order to approximate the effect on share values caused by the restriction.   Notably, the court rejected a calculation of damages based on the actual price later obtained for the plaintiffs' stock—or, for the plaintiffs who retained their shares, the trading price at the time of trial—because such an approach would shift to the defendant the risk of fluctuations in the stock price that were not

---

[98] *Id.* at *15 (internal quotations omitted) (citation omitted).
[99] *Id.* (internal quotations omitted) (citation omitted).
[100] *Id.* at *15 n.88.
[101] 775 A.2d 1019 (Del. 2001).
[102] *Id.* at 1023 (quoting *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 10 (Del. Ch. 1992)).

correlated with the breach. Thus, the award in *Duncan* was tailored to the scope of the injury caused by the breach, and it excluded uncertainties caused by external factors.

Risks of uncertainty concerning future events that are "impossible to know" do not shift to the defendant in a breach of contract case.[103] Here, the uncertainties that bar expectation damages were caused by neither SIGA nor its breach. Rather, they were the result of the same externalities and third-party decisions that compelled the Court of Chancery to find such damages to be too speculative in 2011. These uncertainties include: (i) whether, when, or how FDA approval would be achieved; (ii) feasibility and cost of manufacturing; (iii) potential toxicities; (iv) whether or when sales would occur and the amount of such sales; and (v) the state of the economy, which has limited government spending on biological threat countermeasures. SIGA's bad faith conduct does not absolve PharmAthene of its burden to prove expectation damages with reasonable certainty.

## IV. CONCLUSION

*SIGA I* allowed for the *theoretical* availability of expectation damages for breach of a preliminary agreement. It added the important qualifier that such damages must be established with reasonable certainty. Such requirement is presently firmly grounded not only in New York and California law, but in Delaware's as well. In my view, the Majority erodes the "reasonable certainty" requirement by applying a "presumption that doubts about the extent of damages are generally resolved against the breaching party" to

---

[103] *See id.* at 1023-24 (citing *Madison Fund, Inc. v. Charter Co.*, 427 F. Supp. 597, 608 (S.D.N.Y. 1977)).

the point of speculation, and then taking "into account the willfulness of the breach" in a manner that imposes responsibility on SIGA for uncertainties beyond those that it caused.[104]

I believe that this Court's remand instructions in *SIGA I* were unclear, perhaps prompting the trial court to interpret them in a fashion that essentially ignores the important qualifier regarding the standard of proof.[105] Consequently, it applied the analytical framework borrowed from New York law, without properly accounting for the concomitant limitations on expectation damages, including the requirement that they be established with reasonable certainty. The Majority states that the Dissent's "main dissatisfaction is with *SIGA I* and the rule it adopted permitting the recovery of expectation damages for bad faith breach of Type II agreements."[106] The Majority is incorrect. I do not believe that *SIGA I*'s adoption of New York's analytical framework with respect to preliminary agreements was error. Rather, I respectfully suggest that it is the Majority's application of *SIGA I* that is problematic for the reasons expressed herein.

---

[104] Maj. Op. at 43.

[105] The Majority Opinion suggests that the remand instructions were clear because they instructed the trial court to "determine anew whether expectation damages should be awarded" and to "reconsider the helpfulness of expert testimony directed to expectation damages." *Id.* at 56. But the trial court, perhaps understandably, appears to have interpreted the instructions as a hint that this Court believed that expectation damages were likely available. Yet, this Court, in *SIGA I*, expressly stated that it was not reaching the question of whether such an award "would be too speculative." *SIGA I*, 67 A.3d at 353. Since we made clear in footnote 99 of *SIGA I* that an award of expectation damages "presupposes that the plaintiff can prove damages with reasonable certainty," the remand instructions, to the extent they suggested that an award of expectation damages would likely be available, are inconsistent with *SIGA I*'s recognized need to reach the issue of speculation first—which this Court expressly did not do. *Id.* at 351 n.99.

[106] Maj. Op. at 56.

I appreciate that the trial court, having fashioned two remedial orders, should not be asked to act again to fashion a third remedial order. Nor should the parties be delayed further in obtaining a final resolution in this long-running dispute. But to further push our law in the wrong direction and out of alignment with other major commercial jurisdictions is a more significant error, and one which has far greater consequences than the impacts felt by the parties in this case alone. I would prefer that this Court accept responsibility for its less-than-clear guidance to the trial court in fashioning a remedial order on remand.

I would vacate this Court's prior order and remand with an instruction that, based upon this record, expectation damages for breach of this Type II preliminary agreement are "speculative and too uncertain, contingent, and conjectural[,]"[107] and, as a consequence, only reliance damages are available.[108]

---

[107] *PharmAthene I*, 2011 WL 4390726, at *37 (citing *PharmAthene, Inc. v. SIGA Techs., Inc.*, 2010 WL 4813553, at *11 (Del. Ch. Nov. 23, 2010)).

[108] The Majority states that the Court of Chancery found that reliance damages "would be no remedy at all for SIGA's bad faith breach." Maj. Op. at 56 (citation omitted). In fact, the trial court stated that, "[b]ased on the evidence presented at trial . . . reliance damages here appear to be in the range of only about $200,000, a nominal sum relative to PharmAthene's claimed damages of hundreds of millions of dollars." *PharmAthene II*, 2014 WL 3974167, at *6 n.29. SIGA maintains that PharmAthene made a strategic decision not to proffer any evidence of reliance damages at trial. The record reflects that, on remand, PharmAthene predominantly sought lump sum expectation damages as relief. *Compare* PharmAthene's Pre-Trial Br. on Remand at B638 (urging that PharmAthene is entitled to its "expectation and not simply its reliance interest"), *with* PharmAthene's Post-Hearing Response Br. at B715 (same), *and* SIGA's Op. Br. on Remand at A817 ("If the only reliance damages in the record are *de minimis* (SIGA contends they are not), it is the consequence of a strategy PharmAthene adopted in an effort to press the Court [of Chancery] to make an inappropriately larger award."). The Majority also claims SIGA is "poorly positioned" to argue that the parties' expectations at the time of breach were too speculative. Maj. Op. at 54. As support, it points to SIGA's internal valuations of ST-246, which ranged from $3 billion to $5 billion. *Id.* Yet, its affirmance of a lump sum award of

For the foregoing reasons, I respectfully DISSENT.

---

$113 million undercuts the credibility of those valuations as a tool to appropriately measure damages.